# United States Court of Appeals for the District of Columbia Circuit

ROSALIE SIMON, ET AL.,

*Plaintiffs-Appellees / Cross-Appellants,*

v.

REPUBLIC OF HUNGARY, ET AL.,

*Defendants-Appellants / Cross-Appellees*

– and –

STEVEN ANTHONY HELLER AND CHARLES WILLIAM HELLER,

*Plaintiffs-Appellants,*

v.

REPUBLIC OF HUNGARY,

*Defendant-Appellee*

Consolidated Appeals from the United States District Court for the District of Columbia, Nos. 1:10-cv-01770-BAH and 1:21-cv-01739-BAH

## MOTION OF DEFENDANTS-APPELLANTS/CROSS-APPELLEES THE REPUBLIC OF HUNGARY AND MAGYAR ÁLLAMVASUTAK ZRT. FOR STAY OF MANDATE PENDING PETITION FOR WRIT OF CERTIORARI

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Gregory.Silbert@weil.com
Konrad.Cailteux@weil.com

*Counsel for Defendants-Appellants / Cross-Appellees*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................. 1

Statement of the Case ................................................................ 2

Legal Standard ........................................................................... 3

Argument ..................................................................................... 3

I.    Defendants' Forthcoming *Certiorari* Petition Presents a Substantial Question of Statutory Interpretation, on which the Circuits Are Clearly Split ............................................................ 3

    A.    The panel's decision on property tracing squarely conflicts with Second Circuit decisions. ..................................................... 4

    B.    A grant is also likely because the Supreme Court has granted *certiorari* in this case on a related issue. .................... 7

II.    There Is Good Cause for a Stay of the Mandate Given the Importance of Resolving This Question and Avoiding the Erosion of Defendants' Sovereign Immunity ................................... 9

Conclusion ................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abelesz v. Magyar Nemzeti Bank,*
  692 F.3d 661 (7th Cir. 2012) .................................................... 11, 14

*Bolivarian Republic of Venezuela v. Helmerich & Payne
International Drilling Co.,*
  581 U.S. 170 (2017) ........................................................................ 2, 9

*Federal Republic of Germany v. Philipp,*
  __ U.S. __, 141 S. Ct. 703 (2021) ............................................. *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.,*
  573 U.S. 258 (2014) ............................................................................. 9

*Judicial Watch, Inc. v. National Energy Policy
Development Grp.,*
  2003 WL 22319584 (D.C. Cir. Sept. 30, 2003) ................................. 3

*Kuo v. Government of Taiwan,*
  802 F. App'x 594 (2d Cir. 2020) .................................................. 1, 5, 6

*In re Papandreou,*
  139 F.3d 247 (D.C. Cir. 1998) ......................................................... 12

*Phoenix Consulting Inc. v. Republic of Angola,*
  216 F.3d 36 (D.C. Cir. 2000) ........................................................... 12

*Process and Industrial Developments Ltd. v. Federal
Republic of Nigeria,*
  962 F.3d 576 (D.C. Cir. 2020) ......................................................... 12

*Republic of Hungary v. Simon,*
  141 S. Ct. 691 (2021) ......................................................................... 8

*Rukoro v. Federal Republic of Germany,*
  97 F.3d 218 (2d Cir. 2020) ..................................................... *passim*

*Simon v. Republic of Hungary,*
  77 F.4th 1077 (D.C. Cir. 2023)................................................. *passim*

*Simon v. Republic of Hungary,*
  911 F.3d 1172 (D.C. Cir. 2018) ................................................. 1, 7, 8

*Verlinden B.V. v. Central Bank of Nigeria,*
  461 U.S. 480 (1983) ........................................................... 10

**Statutes**

28 U.S.C. § 1605(a)(3) ............................................................. 4

**Rules**

D.C. Cir. R. 41(a)(2) ............................................................. 2, 3

Fed. R. App. P. 41(d)(1) ......................................................... 2, 3

Sup. Ct. R. 10 ................................................................... 4

**Secondary Sources**

Richard M. Re, *Explaining SCOTUS Repeaters,*
  69 Vand. L. Rev. En Banc 297 (2016)................................................. 8

Stern & Gressman, *Supreme Court Practice* § 4.13 (2020).................. 7

**INTRODUCTION**

When this case was last before this Court, the Supreme Court granted *certiorari* to review a circuit split between this Court and the Seventh Circuit. *See Simon v. Republic of Hungary*, 911 F.3d 1172, 1181 (D.C. Cir. 2018) ("*Simon II*"), *cert. granted* 141 S. Ct. 187 (2020), *vacated and remanded* 141 S. Ct. 691 (2021). Now before this Court again after remand, the panel opinion creates a new split—this time with the Second Circuit. *See Simon v. Republic of Hungary*, 77 F.4th 1077, 1104 (D.C. Cir. 2023) ("*Simon III*").

Specifically, this Court held that plaintiffs invoking the Foreign Sovereign Immunities Act's ("FSIA") expropriation exception *need not* "produce evidence tracing property in the United States or possessed by MÁV to property expropriated from them." *Id*. at 1118 (citation omitted). In doing so, the panel directly contradicted the Second Circuit's decision in *Rukoro v. Federal Republic of Germany*, which held that such tracing is required and dismissal is warranted where a plaintiff cannot "trace the proceeds a sovereign received from expropriated property to funds spent on property present in the United States." 976 F.3d 218, 225-26 (2d Cir. 2020); *see also Kuo v. Government of Taiwan*, 802 F. App'x 594, 597 (2d Cir. 2020) (requiring property tracing to show property was "specifically purchased" with expropriated funds). Further, *Rukoro* rejected the notion

1

that a plaintiff could satisfy his burden of establishing the property tracing requirement with mere pleading presumptions, holding instead that the Supreme Court's decision in *Helmerich* elevated the standard from plausibility to a "valid argument standard." 976 F.3d at 225. The panel here likewise found *Rukoro* "is incorrect" on that point. *Simon III*, 77 F.4th at 1104.

The Court should stay issuance of the mandate until the Supreme Court has had the opportunity to act on Defendants' forthcoming *certiorari* petition. *See* Fed. R. App. P. 41(d)(1); D.C. Cir. R. 41(a)(2). This case presents not just a substantial question, but another direct circuit split regarding the scope of the expropriation exception, on which the Supreme Court previously granted *certiorari* in this case. And there is good cause for a stay because this exceptionally important issue impacts foreign relations, and because continuing litigation in the district court despite likely Supreme Court review would erode the benefit of Defendants' presumptive immunity from suit.

## STATEMENT OF THE CASE

The panel issued its opinion in this case on August 8, 2023. (Doc. 2011346.) Plaintiffs petitioned for panel rehearing or rehearing *en banc* on September 6, 2023, challenging a portion of the decision bearing on the

purportedly stateless claimants. (Doc. 2015516.) After Defendants responded on September 27th pursuant to an order of the Court (Doc. 2019228), rehearing was denied on October 12, 2023. (Docs. 2021608, 2021609.)

## LEGAL STANDARD

To obtain a stay of the mandate pending a *certiorari* petition, a movant "must show that the 'petition would present a substantial question and that there is good cause for a stay.'" *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, No. 02-5355, 2003 WL 22319584, at *1 (D.C. Cir. Sept. 30, 2003) (Edwards, J., concurring) (quoting Fed. R. App. Proc. 41(d)(1)); *see also* D.C. Cir. R. 41(a)(2) (movant must show "good cause for the relief sought").

## ARGUMENT

### I. Defendants' Forthcoming *Certiorari* Petition Presents a Substantial Question of Statutory Interpretation, on which the Circuits Are Clearly Split

The initial requirement for staying the mandate—a substantial question—is met here for two reasons. First, the panel's decision broke from the Second Circuit's decisions in nearly identical cases. Second, the likelihood of a *certiorari* grant is even greater because of the important foreign-policy interests at stake, as well as the Supreme Court's prior grant of *certiorari* in this case and in *Philipp*.

## A. The panel's decision on property tracing squarely conflicts with Second Circuit decisions.

There is a substantial question in this case because the panel's decision in *Simon III* conflicts with decisions of the Second Circuit in virtually identical cases, and directly implicates foreign relations. See Sup. Ct. R. 10 (grounds for *certiorari* include a "decision of another United States court of appeals on the same important matter").

To obtain jurisdiction over a foreign sovereign under the FSIA's expropriation exception, a plaintiff must show, among other requirements, that (a) "property or any property exchanged for such property is present in the United States," or (b) "property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state" and that foreign agency is "engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

The Second Circuit has twice addressed the showing necessary to meet this requirement. In *Rukoro*, as here, plaintiffs sought to hold a sovereign nation (Germany) accountable in a U.S. court for "enslavement and genocide" that occurred many decades earlier in another country (modern-day Namibia). 976 F.3d at 221. Also as here, plaintiffs asserted jurisdiction under the FSIA's expropriation exception and alleged that "Germany derived at least a portion of its wealth from property expropriated" from them. *Id.* at 222. According to plaintiffs' expert, "monies so derived may be

reasonably presumed to have gone into the general coffers of the German official banking system, and since money is fungible, … were later used [by Germany] to purchase various properties in New York." *Id.* at 225 (quotation omitted and alteration adopted).

The Second Circuit found "plaintiffs' allegations insufficient to trace the proceeds from property expropriated more than a century ago to present-day property owned by Germany in New York." *Id.* at 222. The court held that "[t]he conclusory allegations in the amended complaint simply do not suffice to make a valid argument that property converted into currency and comingled with other monies in Germany's general treasury account can be traced to the purchase of property in New York decades later." *Id.* at 225. Thus, the Second Circuit rejected an identical "comingling" theory and required tracing of the property to meet the statutory requirement.

Further, while the Second Circuit found that "[s]uch allegations may satisfy a plausibility standard," it determined they would not satisfy "a valid argument standard," even if supported by declarations that raised a "'reasonable presumption' that comingled funds were used to buy" properties in the United States. *Id.* at 225-26 (second alteration adopted).

Likewise, in *Kuo*, the Second Circuit rejected application of the expropriation exception because plaintiffs did not "show that [Taiwan's U.S.

properties] were specifically purchased using proceeds from the sale of [the allegedly expropriated] property." 802 F. App'x at 597. *Kuo* rejected the notion that jurisdiction would be proper under a comingling theory, simply because "Taiwan does billions of dollars in trade with the United States." *Id.*

The panel's decision in *Simon III* squarely contradicts the Second Circuit's decisions regarding the same legal question and factual scenario. The panel explicitly held that "plaintiffs need not produce evidence directly tracing the liquidated proceeds of their stolen property to funds retained by the defendants in order to survive the defendants' factual challenge to the court's jurisdiction under the FSIA's expropriation exception." *Simon III*, 77 F.4th at 1119. Rather, it put the burden on *Defendants* to disprove that the exception was satisfied, holding further that "plaintiffs had no [] burden" to "produce evidence tracing property in the United States or possessed by MÁV to property expropriated from them during World War II." *Id.* at 1118 (citation omitted). Further, the panel opined that *Rukoro* is "incorrect" and "departed from [this Court's] approach" to the expropriation exception's property tracing requirement. *Id.* at 1104. The conflict is clear: A plaintiff in the Second Circuit must trace property to satisfy the expropriation exception and establish a valid claim to jurisdiction, but a plaintiff in this Court does not.

The conflict between this Court and the Second Circuit is itself a reason to grant *certiorari*. But, in this case, a grant of *certiorari* is even more likely because the decision affects foreign policy, as further discussed in Part II. The circuits' diverging interpretations of the FSIA's expropriation exception will affect whether (and where) certain foreign sovereigns are subject to suit in the United States. As the United States has previously explained in this matter, "domestic litigation against foreign sovereigns, by its nature, often raises serious foreign-policy concerns." Br. for the U.S. in support of Petitioners, *Republic of Hungary v. Simon*, No. 18-1447, 2020 WL 5535982, at *25 (U.S. Sept. 11, 2020). Further, the exercise of jurisdiction over a foreign sovereign by United States courts may subject the United States to reciprocal treatment in foreign jurisdictions. *See infra* Part II. The potential impact on foreign relations is another well-recognized factor that "give[s] rise to review on *certiorari*." Stern & Gressman, *Supreme Court Practice* § 4.13 (2020) (collecting cases). The acknowledged circuit split and the important foreign-policy interests involved make this a substantial question warranting a stay of the mandate.

**B.  A grant is also likely because the Supreme Court has granted *certiorari* in this case on a related issue.**

In *Simon II*, the Supreme Court granted *certiorari* to consider the

scope of the FSIA's expropriation exception—namely, the role of international comity in this context. 141 S. Ct. 187 (2020).[1] In *Federal Republic of Germany v. Philipp*, another case involving the expropriation exception, the Supreme Court also granted *certiorari* to consider the international comity question, as well as the applicability of the domestic takings rule. 141 S. Ct. 185 (2020). The Court's opinion ultimately turned on the domestic takings rule, and both cases were vacated and remanded on that basis. *See generally Federal Republic of Germany v. Philipp*, __ U.S. __, 141 S. Ct. 703 (2021); *Republic of Hungary v. Simon*, 141 S. Ct. 691 (2021).

The Supreme Court has shown an interest in addressing the proper scope of the expropriation exception. That is no surprise, given that this area of law raises special concerns about international friction and reciprocal action, as discussed in Part II. And the current issue regarding the proper interpretation of the FSIA's property tracing requirement is especially important, given that the panel's interpretation would render it a dead letter.

In circumstances such as these, a grant of *certiorari* is more likely. *See* Richard M. Re, *Explaining SCOTUS Repeaters*, 69 VAND. L. REV. EN BANC 297, 305-308 (2016) (studying "repeater" cases and noting that

---

[1] Notably, this Court stayed the then-pending appeal in *Simon*, over plaintiffs' objection, after the Supreme Court granted *certiorari*. (Doc. 1852712.)

"there's good reason to think that the first [*certiorari* grant] makes the second more likely"); *cf. Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) (*certiorari* granted a second time to resolve a new circuit split). The panel's decision has once again called into question the scope of the FSIA's expropriation exception, an issue about which the Supreme Court has recently granted *certiorari* in multiple cases. This bolsters the substantiality of the question and the need to stay the mandate.

## II.   There Is Good Cause for a Stay of the Mandate Given the Importance of Resolving This Question and Avoiding the Erosion of Defendants' Sovereign Immunity

There is also good cause to stay the mandate, for at least two reasons. ***First***, the question presented by Defendants' forthcoming *certiorari* petition is exceptionally important and impacts foreign relations. As the Supreme Court recognized when this case was last before it, the FSIA's expropriation exception must not be "transform[ed] … into an all-purpose jurisdictional hook for adjudicating human rights violations." *Philipp*, 141 S. Ct. at 713. The FSIA should instead be interpreted "to avoid, where possible, 'producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Id.* at 714 (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,

581 U.S. 170, 183 (2017)); *see also id.* ("As a Nation, we would be surprised—and might even initiate reciprocal action—if a court in Germany adjudicated claims by Americans that they were entitled to hundreds of millions of dollars because of human rights violations committed by the United States Government years ago.").

Yet the panel's interpretation of the expropriation exception's property tracing requirement does not heed these warnings. Rather than upholding a meaningful limitation imposed by Congress on foreign-cubed claims, the decision here effectively eviscerates it by treating it as a requirement for *defendants*, not plaintiffs. Specifically, the panel flipped the burden onto foreign sovereigns to "affirmatively establish by a preponderance of the evidence that their current resources do *not* trace back to the property originally expropriated." *Simon III*, 77 F.4th at 1119 (emphasis original). This counter-textual approach greatly expands the expropriation exception's scope and increases the likelihood of international friction. A stay of the mandate is warranted to resolve this important issue, which bears on international relations. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983) ("Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States.").

Such concerns about international friction and reciprocity are particularly acute here because of the sheer scale of this case. On behalf of a putative worldwide class of victims and their descendants, Plaintiffs lay claim to a substantial portion of Hungary's economic output, which would mostly be distributed outside of Hungary, presumably never to return. The Seventh Circuit previously dismissed similar claims after calculating that the plaintiffs were seeking damages equal to "nearly 40 percent of Hungary's annual gross domestic product in 2011," and the court asked "how the United States would react if a foreign court ordered the U.S. Treasury" to pay a group of plaintiffs an equivalent share of U.S. economic output, "which would be roughly $6 trillion." *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 682 (7th Cir. 2012).

In light of these important interests, there is good cause for this Court to stay the mandate and allow the Supreme Court to address the question of statutory interpretation that Defendants will raise in their forthcoming petition.

**Second**, a stay of the mandate is needed to preserve the integrity of Defendants' immunity from suit, should the Supreme Court find in their favor. "It is axiomatic that foreign sovereigns enjoy immunity from litigation burdens as well as from the entry of adverse judgments. The Supreme

Court repeatedly has explained that the 'basic objective' of foreign sovereign immunity is 'to free a foreign sovereign from *suit*.' Likewise, we repeatedly have described the immunity as one 'from trial and the attendant burdens of litigation.'" *Process and Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) (emphasis original) (citations omitted). Allowing further burdensome—and likely unnecessary—litigation to proceed in the district court would undermine the FSIA's construct that "foreign nations are presumptively immune from the jurisdiction of United States courts." *Philipp*, 141 S. Ct. at 707.

This is no ordinary claim of litigation burden, but rather goes to the heart of Defendants' FSIA immunity and the district court's resulting lack of jurisdiction. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) ("If no exception applies, a foreign sovereign's immunity under the FSIA is complete: The district court lacks subject matter jurisdiction over the plaintiff's case."). Because of the critical need to "preserve the full scope of that immunity," courts must determine their jurisdiction as early in the litigation as possible—"to defer the question is to 'frustrate the significance and benefit of entitlement to immunity from suit.'" *Id.* (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990)); *see also In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) ("The infliction of [the burdens of litigation on a

foreign sovereign] may compromise it just as clearly as would an ultimate determination of liability.").

Hungary and MÁV have been opposing this lawsuit for years, up and down the federal courts of a foreign country. The panel's decision remands to the district court for further factual development regarding a number of different points, including (i) whether the Lebovics sisters can "cure the jurisdictional defects in their complaint" (*Simon III*, 77 F.4th at 1107); (ii) whether Zelikovitch and Schlanger "could allege facts consistent with the Second Amended Complaint that would support their claims of Czechoslovakian nationality" (*id.* at 1109); (iii) whether "the property component of the commercial-activity nexus requirement is satisfied" (*id.* at 1119); and (iv) whether "MÁV engages in commercial activity in the United States" (*id.* at 1120-21). The panel also noted that these findings may require "additional jurisdictional discovery or evidentiary submissions." *Id.* at 1119. Defendants should not be required to engage in further complex litigation when it may well be mooted—and determined to be in an improper forum—by a decision of the Supreme Court on the property tracing requirement.

By contrast, Plaintiffs will suffer no significant harm from a stay of the mandate while the Supreme Court has an opportunity to decide this important issue. Though Plaintiffs have previously cited their age as a

reason for expediency, it was Plaintiffs who waited to bring their claims for "more than 65 years after the expropriations took place," and "after Hungary has had more than 20 years of government not dominated by the Soviet Union." *Abelesz*, 692 F.3d at 681. It was Plaintiffs who chose to assert their extraterritorial claims in the United States instead of Hungary. Any additional delay from a stay of the mandate will not cause undue hardship and is justified in the circumstances.

## CONCLUSION

For these reasons, Defendants move the Court to stay issuance of the mandate pending disposition of Defendants' forthcoming petition for *certiorari*.

Respectfully submitted,

*/s/ Gregory Silbert*

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Gregory.Silbert@weil.com
Konrad.Cailteux@weil.com

October 18, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies that this Motion complies with the type-volume limitation of Fed. R. App. P. 25(d)(2) because this document, excluding the exempted portions, contains 2,913 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Century Schoolbook font in 14 point size.

*/s/ Gregory Silbert*

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Gregory.Silbert@weil.com
Konrad.Cailteux@weil.com

October 18, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ *Gregory Silbert*
_____

Gregory Silbert
Konrad L. Cailteux
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Gregory.Silbert@weil.com
Konrad.Cailteux@weil.com

October 18, 2023