NOT YET SCHEDULED FOR ORAL ARGUMENT
Nos. 22-7010, 22-7112

# United States Court of Appeals for the District of Columbia Circuit

ROSALIE SIMON, ET AL.,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

REPUBLIC OF HUNGARY, ET AL.,

*Defendants-Appellants/Cross-Appellees*

– and –

STEVEN ANTHONY HELLER AND CHARLES WILLIAM HELLER,

*Plaintiffs-Appellants,*

v.

REPUBLIC OF HUNGARY,

*Defendant-Appellee*

Consolidated Appeals from the United States District Court for the District of Columbia, Nos. 1:10-cv-01770-BAH and 1:21-cv-01739-BAH

## BRIEF FOR DEFENDANTS-APPELLANTS/CROSS-APPELLEES THE REPUBLIC OF HUNGARY AND MAGYAR ÁLLAMVASUTAK ZRT.

Konrad L. Cailteux
Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Konrad.Cailteux@weil.com
Gregory.Silbert@weil.com

*Counsel for Defendants-Appellants/Cross-Appellees*

## CIRCUIT RULE 28(a)(1) CERTIFICATE

Defendants-Appellants/Cross-Appellees Hungary and Magyar Államvasutak Zrt. ("MÁV") hereby certify as follows:

### A. Parties

**No. 22-7010**: The Defendants-Appellants/Cross-Appellees are Hungary and MÁV.

The Plaintiffs-Appellees are Rosalie Simon, Helen Herman, Charlotte Weiss, Helena Weksberg, Rose Miller, Tzvi Zelikovitch, Magda Kopolovich Bar-Or, Zehava (Olga) Friedman, Yitzhak Pressburger, Alexander Speiser, Ze-ev Tibi Ram, Vera Deutsch Danos, Ella Feuerstein Schlanger, Moshe Perel.

**No. 22-7112**: The Plaintiffs-Appellants are Steven Heller and Charles Heller. The Defendant-Appellee is Hungary.

### B. Rulings Under Review

The rulings under review are: (i) the March 11, 2020 Memorandum Opinion of the United States District Court for the District of Columbia (Howell, J.) in *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, denying Defendant-Appellants' motion to dismiss; (ii) the December 30, 2021 Memorandum Opinion and the associated December 30, 2021 Order of the United States District Court for the District of Columbia (Howell, J.) in

i

*Simon v. Republic of Hungary*, Civil Action No. 1:10-cv-1770-BAH, denying in part Defendants-Appellants' motion to dismiss (Dkt. 174, 175; Joint Appendix ("JA-") at JA-1872, -1874); and (iii) the July 18, 2022 Memorandum Opinion and Order of the United States District Court for the District of Columbia (Howell, J.) in *Heller v. Republic of Hungary*, Civil Action No. 1:21-cv-1739-BAH, granting Defendants-Appellants' motion to dismiss (*Heller* Dkt. 17; JA-2477).

## C. Related Cases

This Court has issued two published opinions on prior appeals in this case. *See Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016) ("*Simon I*"); *Simon v. Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. 2018) ("*Simon II*") (rehearing *en banc* denied Feb. 15, 2019). The Supreme Court then granted certiorari in *Simon II,* to review the issue of international comity-based abstention. *See Republic of Hungary v. Simon*, 141 S. Ct. 187 (2020). The Supreme Court also granted certiorari in *Federal Republic of Germany v. Philipp*, 141 S. Ct. 185 (2020), as to both the questions of international comity and whether the domestic takings rule applies to the FSIA's expropriation exception, an issue decided by this Court in *Simon I*. In February 2021, the Supreme Court issued its decision in *Philipp*, finding that the FSIA's expropriation exception incorporates the domestic tak-

ings rule, and that a sovereign's expropriation of its own nationals' property is not a violation of international law. *See Philipp*, 141 S. Ct. 703. The Supreme Court did not reach the issue of international comity abstention. The Supreme Court vacated the judgment of the D.C. Circuit in *Simon II* and remanded "for further proceedings consistent with the decision" in *Philipp. Simon*, 141 S. Ct. 691.

Following the Supreme Court's decision, the D.C. Circuit remanded the 2017 *Simon* appeal to the District Court for "further proceedings consistent with" *Philipp. Simon v. Republic of Hungary*, 839 F. App'x 570 (D.C. Cir. 2021). The D.C. Circuit also remanded the 2020 *Simon* appeal to the District Court. Order, *Simon*, No. 20-7025 (Apr. 28, 2021) (per curiam).

Hungary and MÁV are also aware of the following potentially related cases: *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012); *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015); *de Csepel v. Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022); *de Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017); *de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013).

**DISCLOSURE STATEMENT PURSUANT TO RULE 26.1**

Defendant-Appellant/Cross-Appellee, the Republic of Hungary ("Hungary"), is a sovereign nation. Defendant-Appellant/Cross-Appellee Magyar Államvasutak Zrt. ("MÁV"), is the Hungarian national railway company. MÁV is 100% owned by Hungary. MÁV has no parent corporations. No publicly traded company holds a 10% or greater ownership interest in MÁV.

# TABLE OF CONTENTS

Introduction .................................................................................. 1

Jurisdictional Statement ............................................................... 4

Statement of Issues ...................................................................... 5

Statement of the Case .................................................................. 6

    A.  Proceedings prior to the District Court decisions now on
        review ................................................................................ 6

        1.  *Simon I* .................................................................. 6

        2.  *Simon II* ................................................................. 8

        3.  The Supreme Court's decisions ............................... 8

    B.  The District Court's decisions now on review ............................. 9

Summary of the Argument ......................................................... 11

Standard of Review .................................................................... 13

Argument .................................................................................... 13

  I.  Plaintiffs have not shown that property was taken in violation
     of international law .............................................................. 14

    A.  Plaintiffs are judicially estopped from denying Hungarian
        nationality ...................................................................... 15

    B.  Plaintiffs failed to meet the required *Helmerich* "valid
        claim" standard for FSIA jurisdiction ........................................ 19

    C.  Even under a pre-*Helmerich* standard, Plaintiffs' allegations
        of Czechoslovakian nationality fail ............................................ 23

  II.  The Treaty Exception of the FSIA bars suit by Czechoslovakian
      nationals .............................................................................. 28

    A.  The text of the 1947 Peace Treaty extinguishes Plaintiffs'
        claims ........................................................................... 29

    B.  Under centuries of international law, peace treaties
        extinguish all war-related claims ............................................... 33

  III. Plaintiffs have not satisfied the Expropriation Exception's
      property nexus requirement .................................................. 36

A.  Plaintiffs did not make out a valid claim that Hungary or MÁV possess property expropriated from Plaintiffs or property exchanged for it ............................................................ 37

B.  Even under a pre-*Helmerich* standard, the complaint must be dismissed because Defendants showed that no property in their possession can be traced to property expropriated from plaintiffs ................................................................ 42

IV. Hungary and MÁV do not engage in commercial activity in the United States ................................................................. 49

A.  The District Court erred in concluding that Plaintiffs satisfied the commercial-activity requirement as to Hungary ................................................................. 49

B.  The District Court erred in concluding that Plaintiffs satisfied the commercial-activity requirement as to MÁV ................................................................. 54

Conclusion ................................................................. 59

Addendum: Statutes and Regulations ......................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alperin v. Vatican Bank,*
  2007 WL 4570674 (N.D. Cal. Dec. 27, 2007)) ................................. 43, 44

*Arch Trading Corp. v. Republic of Ecuador,*
  839 F.3d 193 (2d Cir. 2016) ................................................... 55

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................ 23

*Asociacion de Reclamantes v. United Mexican States,*
  735 F.2d 1517 (D.C. Cir. 1984) ................................... 33, 34, 35

*Association of American Physicians & Surgeons, Inc. v.
  Schiff,*
  23 F.4th 1028 (D.C. Cir. 2022) .............................................. 23

*Azima v. RAK Investment Authority,*
  926 F.3d 870 (D.C. Cir. 2019) ................................................ 5

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................ 23

*Blenheim Capital Holdings Ltd. v. Lockheed Martin Corp.,*
  2022 WL 16936367 (4th Cir. Nov. 15, 2022) ........................ 52

*Bolivarian Republic of Venezuela v. Helmerich & Payne
  International Drilling Co.,*
  137 S. Ct. 1312 (2017) .................. 2, 11, 15, 19-23, 27, 37, 38, 42, 44, 49

*Burger-Fischer v. Degussa AG,*
  65 F. Supp. 2d 248 (D.N.J. 1999) ...................................... 36, 46

*Cicippio v. Islamic Republic of Iran,*
  30 F.3d 164 (D.C. Cir. 1994) ................................................ 52

*Cooper Industries, Inc. v. Avall Services, Inc.,*
  543 U.S. 157 (2004) ............................................................ 23

*Culbertson v. Berryhill,*
  __ U.S. __, 139 S. Ct. 517 (2019) ........................................ 39

vii

*Dames & Moore v. Regan,*
  453 U.S. 654 (1981) ................................................................ 34

*de Csepel v. Republic of Hungary,*
  714 F.3d 591 (D.C. Cir. 2013) ............................................... 29

*Doe v. Exxon Mobil Corp.,*
  654 F.3d 11 (D.C. Cir. 2011) ................................................ 35

*Doe v. Federal Democratic Republic of Ethiopia,*
  851 F.3d 7 (D.C. Cir. 2017) ................................................... 13

*Dole Food Co. v. Patrickson,*
  538 U.S. 468 (2003) ............................................................... 38

*Federal Republic of Germany v. Philipp,*
  141 S. Ct. 703 (2021) ............................................. 1, 8, 9, 14, 49

*First National City Bank v. Banco Para el Comercio Exterior*
  *de Cuba,*
  462 U.S. 611 (1983) .......................................................... 53, 55

*Freund v. Republic of France,*
  592 F. Supp. 2d 540 (S.D.N.Y. 2008) ................................. 43, 44

*GSS Group Ltd. v. National Port Authority,*
  680 F.3d 805 (D.C. Cir. 2012) ............................................... 55

*Heller v. Republic of Hungary,*
  2022 WL 2802351 (D.D.C. July 18, 2022) ............................ 10

*Heroth v. Kingdom of Saudi Arabia,*
  331 F. App'x 1 (D.C. Cir. 2009) ............................... 4, 50, 51, 52

*Hwang Geum Joo v. Japan,*
  413 F.3d 45 (D.C. Cir. 2005) ................................................ 36

*Ivanenko v. Yanukovich,*
  995 F.3d 232 (D.C. Cir. 2021) ............................................... 22

*Kareem v. Haspel,*
  986 F.3d 859 (D.C. Cir. 2021) ............................................... 23

*King v. Burwell,*
  576 U.S. 473 (2015) ............................................................... 23

*Kuo v. Government of Taiwan,*
  802 F. App'x 594 (2d Cir. 2020) ........................................... 41

*MacArthur Area Citizens Association v. Republic of Peru,*
  809 F.2d 918 (D.C. Cir. 1987) .................................................. 13

*Medellín v. Texas,*
  552 U.S. 491 (2008) ................................................................ 29

*Molock v. Whole Foods Market Group, Inc.,*
  952 F.3d 293 (D.C. Cir. 2020) ................................................ 43

*New Hampshire v. Maine,*
  532 U.S. 742 (2001) ................................................................ 16

*Owens v. BNP Paribas, S.A.,*
  897 F.3d 266 (D.C. Cir. 2018) ................................................ 26

*Phoenix Consulting, Inc. v. Republic of Angola,*
  216 F.3d 36 (D.C. Cir. 2000) .................................................. 14

*Process & Industrial Developments Ltd. v. Federal Republic
  of Nigeria,*
  962 F.3d 576 (D.C. Cir. 2020) ................................................ 21

*Pruell v. Caritas Christi,*
  645 F.3d 81 (1st Cir. 2011) ..................................................... 43

*Republic of Hungary v. Simon,*
  141 S. Ct. 691 (2021) ............................................................ 8, 9

*Rosner v. United States,*
  231 F. Supp. 2d 1202 (S.D. Fla. 2002) .................................. 45

*Rukoro v. Federal Republic of Germany,*
  976 F.3d 218 (2d Cir. 2020) ..................... 3, 13, 21, 22, 38, 40

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993) ................................................................ 50

*Schubarth v. Federal Republic of Germany,*
  2017 WL 11534689 (D.C. Cir. Oct. 10, 2017) ....................... 22

*Schubarth v. Federal Republic of Germany,*
  891 F.3d 392 (D.C. Cir. 2018) ................................................ 22

*Simon v. Republic of Hungary,*
  277 F.3d 42 (D.D.C. 2017) ....................................................... 8

*Simon v. Republic of Hungary,*
  37 F. Supp. 3d 381 (D.D.C. 2014) ........................................... 6

ix

*Simon v. Republic of Hungary*,
 443 F. Supp. 3d 88 (D.D.C. 2020) ......................... 9, 39, 44, 45, 47, 50-58

*Simon v. Republic of Hungary*,
 812 F.3d 127 (D.C. Cir. 2016) ..... 1, 2, 4, 7, 16, 17, 22, 24, 29, 34, 37, 39,
 42, 45, 46, 48

*Simon v. Republic of Hungary*,
 911 F.3d 1172 (D.C. Cir. 2018) ................................................. 9

*Simon v. Republic of Hungary*,
 No. 17-7146, Dkt. No. 1890118 (D.C. Cir. Mar. 16, 2021) .................... 9

*Temple University Hospital, Inc. v. NLRB*,
 929 F.3d 729 (D.C. Cir. 2019) ................................................. 16

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
 200 F.3d 843 (D.C. Cir. 2000) ...............................................55, 56, 57, 58

*Valambhia v. United Republic of Tanzania*,
 964 F.3d 1135 (D.C. Cir. 2020) ............................................ 22

*Verlinden B.V. v. Central Bank of Nigeria*,
 461 U.S. 480 (1983)........................................................ 48

*Ware v. Hylton*,
 3 U.S. 199 (1796) ........................................................ 35, 36

**Statutes**

22 U.S.C. § 2753(a)........................................................ 51

28 U.S.C. § 1291 ......................................................... 5

28 U.S.C. § 1330(a)....................................................... 4

28 U.S.C. § 1331 ......................................................... 4

28 U.S.C. § 1332 ......................................................... 4

28 U.S.C. § 1603(d) ...................................................... 50, 51

28 U.S.C. § 1604 ......................................................... 28

28 U.S.C. § 1605(a)(3) ................................................ 4, 14, 36-40, 49, 53

28 U.S.C. § 2201(a)....................................................... 4

**Treaties**

Treaty of Peace With Hungary, Feb. 10, 1947, 61 Stat. 2065,
    41 U.N.T.S. 135 ...........................................1, 2, 5, 6, 12, 16-18, 29-33, 35

Treaty of Peace between the Allied and Associated Powers
    and Hungary and Protocol and Declaration (June 4, 1920) ...25, 27, 28

**Other Authorities**

"Czechoslovakia and Successor States: Czech Republic, Slo-
    vakia," United Nations, available at https://perma.cc/
    7WRW-Y5WU (last accessed Nov. 20, 2022). ....................................... 30

Defense Security Cooperation Agency, *Foreign Military Sales
    FAQ*, available at https://perma.cc/E673-YHH6 (last
    accessed Nov. 21, 2022) .......................................................... 51

Edwin Borchard, The Diplomatic Protection of Citizens
    Abroad (1915) .......................................................... 36

Exceptions to sovereign immunity—Violations of interna-
    tional law, 2 International Business Transactions § 34:30
    (3d ed.) .......................................................... 43

Louis Henkin, Foreign Affairs and the Constitution (1972)..................... 33

Merriam Webster Online Dictionary, "Arguable," available at
    https://perma.cc/47CC-L5MB (last accessed Nov. 21, 2022)............... 20

Restatement (Second) of Foreign Relations Law of the United
    States § 212................................................................. 33

Restatement (Third) of Foreign Relations Law of the United
    States §211(h)............................................................. 25

Restatement (Third) of Foreign Relations Law of the United
    States § 902 cmt. (h)(1) (1987) .............................................. 34

Rudolf Dolzer, *The Settlement of War-Related Claims: Does
    International Law Recognize a Victim's Private Right of
    Action? Lessons after 1945*, 20 BERKELEY J. INT'L L. 296
    (2002).......................................................... 34

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Dkt. | Documents in the district court record in the *Simon* matter, unless otherwise indicated |
| FSIA | Foreign Sovereign Immunities Act |
| FMSP | Foreign Military Sales Program |
| JA | Joint Appendix, filed November 21, 2022 |
| MÁV | Magyar Államvasutak Zrt. |
| MÁV-START | MÁV-START Zrt. |
| ÁKK | Államadósság Kezelő Központ Zártkörűen Működő Részvénytársaság, the Government Debt Management Agency Pte Ltd. of the Republic of Hungary |

# INTRODUCTION

Plaintiffs allege that sovereign defendants Hungary and MÁV expropriated property from them during World War II. This Court previously held that "[a]ll fourteen [Plaintiffs in this case] were Hungarian nationals" when the takings occurred. *Simon v. Republic of Hungary*, 812 F.3d 127, 134 (D.C. Cir. 2016). After that decision, the Supreme Court held that "a country's alleged taking of property from its own nationals" does not give rise to jurisdiction under the Foreign Sovereign Immunities Act. *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 707-08 (2021). That rule ends this case.

The district court (Howell, J.) held instead that the case should go forward on the ground that some Plaintiffs *might* have been Czechoslovakian nationals—though the court acknowledged that no Plaintiff actually pleads facts necessary to establish Czechoslovakian nationality. The first problem with this ruling is that Plaintiffs' nationality was not an open question. Plaintiffs themselves argued in a prior appeal that they were Hungarian nationals. This Court agreed with them. And it expressly relied on Plaintiffs' Hungarian nationality to hold that their claims survived the 1947 Peace Treaty with Hungary, because the Allied Powers "had no power to settle or waive the extra-treaty claims of another country's (Hun-

gary's) nationals." *Simon I*, 812 F.3d at 138. Having won before by assert-ing Hungarian nationality, Plaintiffs cannot assert a different nationality now just because their incentives have changed.

Even if Plaintiffs were now free to claim Czechoslovakian nationality, they did not plead or prove it. The district court acknowledged as much. It bemoaned the "dearth of facts" in Plaintiffs' "spectacularly unhelpful pleading," and observed that "any or all" of the remaining Plaintiffs could have been Hungarian nationals. But it still allowed nine Plaintiffs' claims to proceed, concluding that they might have been Czechoslovakian nation-als instead. That is not enough to hale a foreign government into a U.S. court. As the Supreme Court recently explained, there must actually *be* jurisdiction for a case to proceed against a foreign sovereign. *See Bolivar-ian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017). An argument—even a "good argument"—to that ef-fect "is not sufficient." *Id.*

Alternatively, if Plaintiffs *were* Czechoslovakian nationals at the time of the takings, their claims are barred for a different reason: They were settled by the 1947 Peace Treaty with Hungary. The treaty, signed by Czechoslovakia and the United States (among other nations), expressly "settle[s] questions" resulting from World War II. It provides comprehen-sive remedies and procedures to address the same wartime property losses

Plaintiffs allege in this case, including provisions dealing specifically with "the case of Czechoslovak nationals." And it permits "arrangements in lieu of [its] provisions" only when the property owner "and the Hungarian government … agree" to substitution. This Court previously held that a different treaty provision—dealing with claims by *Hungarian* nationals—was not an exclusive remedy, because the Allied Powers could not settle claims belonging to nationals of a different nation. But Czechoslovakia could, and did, settle claims of Czechoslovakian nationals.

The complaint should also be dismissed for the independent reason that Plaintiffs did not establish the necessary property nexus. They had to show that "property exchanged for [their] property" was used in the United States by Hungary and was possessed by MÁV. As the Second Circuit recently held, that means Plaintiffs had to trace the property expropriated from them to property possessed by Defendants. *See Rukoro v. Federal Republic of Germany*, 976 F.3d 218, 225 (2d Cir. 2020). And they had to make this showing as of the time they filed their complaint—more than 65 years after the takings. They never attempted to do so, and Hungary's evidence showed any such tracing would be impossible.

Finally, Plaintiffs did not establish that Hungary and MÁV engaged in commercial activity in the United States. This Court has already

3

squarely rejected the lower court's first ground for finding commercial activity—purchasing military equipment in a government-to-government sales program overseen by the U.S. State Department. *See Heroth v. Kingdom of Saudi Arabia*, 331 F. App'x 1, 2 (D.C. Cir. 2009) (per curiam). The other activity the court relied on to find jurisdiction over Hungary—issuing government bonds that a different entity marketed and paid interest on in the United States—is not sufficient either. As for MÁV, it did not even engage in the activity the court cited to find jurisdiction over it (selling railway tickets). That was done by a different entity, which is not a defendant here and whose conduct cannot be attributed to MÁV.

"The wartime wrongs inflicted upon Hungarian Jews by the Hungarian government are unspeakable and undeniable." *Simon I*, 812 F.3d at 132. Hungary has enacted reparation laws and made other provisions for the victims of its fascist and communist eras. These wrongs committed overseas in past generations are not redressable by private litigants asserting claims against a foreign government in a U.S. court.

## JURISDICTIONAL STATEMENT

Plaintiffs alleged jurisdiction in the district court under 28 U.S.C. §§ 1330(a), 1331, 1332, 1605, and 2201(a). JA-258 (Dkt. 118 ¶ 86). On December 30, 2021, the district court issued its order denying in part Appel-

4

lants' motion to dismiss. JA-1872 (Dkt. 174). On January 12, 2022, Appellants timely filed their notice of appeal. JA-1949 (Dkt. 177). This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine, which allows immediate appeal from "[t]he denial of a motion to dismiss on the ground of sovereign immunity" under the FSIA. *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019) (citation omitted).

## STATEMENT OF ISSUES

1.   In a prior appeal, Plaintiffs successfully argued they were Hungarian nationals. Have Plaintiffs made out a valid claim that they were nationals of a nation other than Hungary, as required for subject-matter jurisdiction under the Foreign Sovereign Immunities Act?

2.   The 1947 Peace Treaty with Hungary provides the exclusive remedy against Hungary for World War II-era property losses by United Nations nationals or stateless persons. If Plaintiffs were Czechoslovakian nationals or stateless, as they now contend, are their claims barred by the treaty exception to jurisdiction under the Foreign Sovereign Immunities Act?

3.   No property in the United States or possessed by Defendants is traceable to property expropriated from Plaintiffs during World War II. Have Plaintiffs made out a valid claim that "property exchanged for [their]

property" is present in the United States or possessed by MÁV, as required for jurisdiction under the Foreign Sovereign Immunities Act?

4.  Have Plaintiffs made out a valid claim that each Defendant engaged in commercial activity in the United States?

## STATEMENT OF THE CASE

This appeal marks the third time this case has come before this Court to address jurisdiction under the Foreign Sovereign Immunities Act, and the first time this Court will consider jurisdiction after remand from the Supreme Court.

### A.  Proceedings prior to the District Court Decisions Now on Review

#### 1.  *Simon I*

In 2010, Plaintiffs filed a complaint on behalf of a putative worldwide class of current and former Hungarian nationals, seeking billions of dollars from Defendants for alleged expropriations of property during World War II. *See* JA-42 (Dkt. 1). The district court found that the 1947 Peace Treaty[1] between Hungary and the Allied Powers "trigger[ed] the FSIA's treaty exception to deprive [the district court] of subject matter jurisdiction over the plaintiffs' claims." *Simon v. Republic of Hungary*, 37 F. Supp. 3d 381, 407 (D.D.C. 2014).

---

[1] The Treaty of Peace With Hungary, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135 ("1947 Peace Treaty").

This Court reversed, holding that the treaty exception did not bar claims asserted by *Hungarian nationals*: The treaty parties "could not render that means of recovery an exclusive one because they had no power to settle or waive the extra-treaty claims of another country's (Hungary's) nationals." *Simon I*, 812 F.3d at 138; *see also id*. at 134 ("All fourteen [named Plaintiffs] were Hungarian nationals during World War II.").

The Court also held that Plaintiffs had alleged takings in violation of international law, a jurisdictional requirement. In a ruling that would later be overturned by the Supreme Court, this Court held that the "domestic takings rule"—the rule that a sovereign's expropriation of property from its own nationals does not implicate international law—"has no application in the unique circumstances of this case, in which genocide constitutes the pertinent international-law violation." *Simon I*, 812 F.3d at 144-45 (cleaned up). Turning to the commercial-nexus requirement, the Court held that allegations that Defendants commingled proceeds of expropriated property with general revenues were sufficient "to raise a plausible inference[] that the defendants retain the property or proceeds thereof." *Id*. at 147 (citation omitted). The Court then remanded to the district court to consider, among other things: "[W]hether, as a matter of international comity, the court should decline to exercise jurisdiction unless and until the plaintiffs exhaust available Hungarian remedies." *Id*. at 149.

7

### 2. *Simon II*

On remand from this Court, the district court again dismissed Plaintiffs' claims, this time on the grounds of comity-based abstention and *forum non conveniens. See Simon v. Republic of Hungary*, 277 F.3d 42, 67 (D.D.C. 2017). A divided panel of this Court reversed as to both grounds for dismissal, reinstating the case for a second time. *See Simon II*, 911 F.3d 1172 (D.C. Cir. 2018).

### 3. *The Supreme Court's Decisions*

On July 2, 2020, the Supreme Court granted Hungary's certiorari petition to review this Court's comity ruling. On the same day, the Supreme Court granted certiorari in another case with overlapping issues, to consider both comity-based abstention and the interpretation of the expropriation exception that this Court had relied on to find an international-law violation in *Simon I. See Republic of Hungary v. Simon*, 141 S. Ct. 691 (2021); *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021).

The Supreme Court issued both decisions on February 3, 2021. In *Philipp*, it reversed this Court's ruling that a plaintiff could establish FSIA jurisdiction based on a sovereign's expropriations from its own nationals. *See generally Philipp*, 141 S. Ct. 703. It held instead that "[t]he phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international

8

law of expropriation [not human rights] and thereby incorporates the do-mestic takings rule." *Id.* at 715.

Having rejected the basis for subject-matter jurisdiction that this Court relied on in *Simon I*, the Supreme Court vacated the *Simon II* deci-sion and "remanded for further proceedings consistent with the decision in" *Philipp*. *Simon*, 141 S. Ct. at 691. The Supreme Court did not reach the issue of international comity before it in *Simon*. On March 16, 2021, this Court remanded the case to the district court for further proceedings consistent with *Philipp*. *See Simon v. Republic of Hungary*, No. 17-7146, Dkt. No. 1890118 (D.C. Cir. Mar. 16, 2021).

### B.   The District Court's Decisions Now on Review

There are three district court decisions currently before this Court on appeal:

**1. *The March 2020 Decision***: During the Supreme Court proceed-ings, Hungary again moved in the district court to dismiss the operative complaint for failing to satisfy the expropriation exception's commercial-activity requirement. In March 2020, the district court denied Hungary's motion. *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 116 (D.D.C. 2020). Hungary appealed and this Court held the appeal in abeyance pending the Supreme Court's decisions in *Simon* and *Philipp*. *See* Order,

9

No. 20-7025 (D.C. Cir. July 21, 2020), Dkt. No. 1852712. This Court subsequently remanded this unbriefed appeal to the district court to consider the effect of the Supreme Court's rulings. On remand, the district court adhered to its original opinion.

**2. *The December 2021 Decision***: The district court denied Hungary's motion to dismiss as to nine of the Named Plaintiffs. It allowed their claims to proceed after finding that—at least at the motion-to-dismiss stage—the FSIA's expropriation exception applied to their claims because they might have been Czechoslovakian nationals at the time of the alleged takings. The court acknowledged, however, that facts necessary for Czechoslovakian nationality had not been established, and any or all of these nine Named Plaintiffs could be shown to be Hungarian nationals.

The district court also dismissed the claims of four Plaintiffs who were definitively shown to be Hungarian nationals. The court rejected these Plaintiffs' argument that they alleged an international-law violation, notwithstanding the domestic-takings rule, because they had purportedly been rendered "stateless" at the time of the takings. The statelessness ruling is before the Court on Plaintiffs' cross-appeal.

**3. *The* Heller *Decision***: In *Heller v. Republic of Hungary*, 2022 WL 2802351 (D.D.C. July 18, 2022), which has been consolidated with *Simon* in this appeal, the district court dismissed the Hungarian Plaintiffs' claims

10

under the domestic-takings rule and rejected the same argument advanced by the four *Simon* Plaintiffs whose claims were dismissed—that they alleged an international-law violation because they were rendered stateless.

## SUMMARY OF THE ARGUMENT

I. In *Simon I*, Plaintiffs successfully argued they were Hungarian nationals, and this Court expressly relied on Plaintiffs' Hungarian nationality to rule in Plaintiffs' favor. Now—after the Supreme Court held there is no jurisdiction over claims by Hungarian nationals—Plaintiffs reverse course and argue they were really Czechoslovakian nationals instead. The judicial-estoppel doctrine prevents Plaintiffs from making this about-face.

Regardless, no Plaintiff established Czechoslovakian nationality. Under *Helmerich*, Plaintiffs had to make out a "valid claim" that they were, in fact, Czechoslovakian nationals at the time of the takings. *Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. at 1318. But, as the district court acknowledged, Plaintiffs' "spectacularly unhelpful pleading" failed to allege facts essential for Czechoslovakian nationality, and "any or all" of the remaining Plaintiffs could have been Hungarian nationals. JA-1933 to -1934 (Dkt. 175). That does not meet *Helmerich*'s heightened "valid claim" test or even the pre-*Helmerich* standard.

11

II. If Plaintiffs *were* Czechoslovakian nationals, their claims would be barred by the FSIA's treaty exception. The 1947 Peace Treaty with Hungary settles claims by Czechoslovakian (and other United Nations) nationals for wartime property confiscations, and it establishes an exhaustive procedure for claimants to recover losses. It requires that claims "be made to the Hungarian authorities," unless the claimant "and the Hungarian government … agree" on alternative arrangements. The treaty also establishes a "Conciliation Commission" of interested governments to resolve disputes. There is no room in this comprehensive scheme for private parties to sue Hungary in U.S. courts for the same losses settled by the treaty. In *Simon I*, this Court held that the treaty exception did not bar claims by *Hungarian nationals*, because the Allied Powers could not espouse and settle claims by the nationals of another nation (Hungary). But if Plaintiffs were deemed Czechoslovakian nationals, the opposite would be true: The treaty exception would apply.

III. To establish jurisdiction under the expropriation exception, Plaintiffs must show that, when the complaint was filed, Hungary used property exchanged for Plaintiffs' property in the United States for a commercial activity, and that MÁV possessed property exchanged for Plaintiffs' property. Plaintiffs made no attempt to trace property expropriated from them to property possessed or used by Defendants when the lawsuit was

12

filed, 65 years after the war. Defendants, by contrast, presented uncontested evidence that any such tracing would be impossible. As the Second Circuit recently held when faced with the identical issue, Plaintiffs have not satisfied the expropriation exception's property-nexus requirement. *See Rukoro*, 976 F.3d at 225.

IV. Plaintiffs also failed to show that Hungary and MÁV engaged in commercial activities in the United States. Hungary's activities—issuing government bonds and buying military equipment in a government-to-government sales program—are not commercial acts in the U.S. sufficient to deprive Hungary of sovereign immunity. And the conduct attributed to MÁV—selling railway tickets—was done by a separate (non-defendant) entity, which was not acting as MÁV's agent.

## STANDARD OF REVIEW

This Court reviews questions of FSIA sovereign immunity *de novo*. *See Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7, 9 (D.C. Cir. 2017).

## ARGUMENT

The FSIA "sets forth 'the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States.'" *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 919 (D.C. Cir. 1987) (quoting H.R.

13

Rep. No. 97-1487). To establish jurisdiction over sovereign defendants Hungary and MÁV, Plaintiffs must come within an exception to the FSIA's broad grant of immunity. "If no exception applies, a foreign sovereign's immunity under the FSIA is complete: The district court lacks subject matter jurisdiction over the plaintiff's case." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). Plaintiffs assert jurisdiction solely under the FSIA's "expropriation exception." 28 U.S.C. § 1605(a)(3).

## I.  Plaintiffs Have Not Shown That Property Was Taken in Violation of International Law

To come within the expropriation exception, Plaintiffs' claims must involve "property taken in violation of international law." 28 U.S.C. § 1605(a)(3). Under the domestic-takings rule, a sovereign's expropriation of property from its own nationals does not implicate international law. *See Philipp*, 141 S. Ct. at 715. So Plaintiffs had to show—both plead and prove—that they were nationals of a nation other than Hungary at the time of the takings. Because no Plaintiff made this showing, the entire *Simon* complaint should have been dismissed.

The district court held otherwise as to the nine remaining *Simon* Plaintiffs because it made three errors.[2] *First*, the court should not have

---

[2] The claims of four *Simon* Plaintiffs and the entire *Heller* complaint were dismissed under the domestic-takings rule.

reached the issue of Plaintiffs' nationality at all because Plaintiffs are ju-
dicially estopped from denying Hungarian nationality. In *Simon I*, Plain-
tiffs argued that they were Hungarian nationals, and this Court relied on
that argument to revive their complaint. *Second*, even if Plaintiffs' nation-
ality were an open question, the district court applied the wrong standard.
It asked whether it was "plausible" that Plaintiffs could show Czechoslo-
vakian nationality. JA-1934 to -1941 (Dkt. 175). But after the Supreme
Court's decision in *Helmerich*, mere plausibility is not enough; Plaintiffs
must "make out a legally valid claim" that they were Czechoslovakian na-
tionals at the time of the takings. 137 S. Ct. at 1316. *Third*, the district
court misapplied even the incorrect plausibility standard. As the court re-
peatedly recognized, "infer[ring] [Czechoslovakian nationality] require[d]
a chain longer than the Court should be assembling on its own" "on ac-
count of the spectacularly unhelpful pleading." JA-1934 (Dkt. 175).

### A. Plaintiffs Are Judicially Estopped from Denying Hungarian Nationality

In this appeal, nine *Simon* Plaintiffs *deny* Hungarian nationality at
the time of the takings. But in *Simon I*, all the Plaintiffs asserted the op-
posite—they argued they *were* Hungarian nationals in order to oppose
Hungary's defense under the FSIA's treaty exception. And Plaintiffs' ar-
gument succeeded: This Court relied on Plaintiffs' Hungarian nationality
to reverse the dismissal of the complaint based on the treaty exception.

*Simon I*, 812 F.3d at 132. Judicial estoppel prevents Plaintiffs "from prevailing" in *Simon I* "on an argument and then relying on a contradictory argument to prevail" now. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).

Three "key factors [] inform the decision whether the balance of equities favors applying the [judicial-estoppel] doctrine in a particular case: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 733 (D.C. Cir. 2019) (quotation omitted). Each factor weighs in favor of estopping Plaintiffs from now denying Hungarian nationality.

*First*, to avoid application of the treaty exception in *Simon I*, Plaintiffs argued that they were Hungarian nationals. They contended that their losses fell within "Article 27" of the 1947 Peace Treaty, "where Hungary 'undertook' to restore property of its *own nationals*." *Simon I*, 2014 WL 6603413, at *3-4 (Plaintiffs' Reply Brief) (emphasis added). And Plaintiffs

16

distinguished their Article 27 losses from losses under Article 26, "in which Hungary agreed to restore property taken from … *foreign nationals*" (including nationals of Czechoslovakia). *Id*. at *3 (emphasis added). Based on this distinction, Plaintiffs argued that binational agreements applying the 1947 Peace Treaty that Hungary had cited—agreements suggesting the treaty was the exclusive means of recovery—were not relevant. "[T]hese agreements," Plaintiffs noted, "all relate to Article 26 of the Treaty," which applies to "foreign nationals—not Article 27," applicable to Hungary's "own nationals." *Id*. Plaintiffs also said they "were Hungarian nationals or citizens in name only, not substance, as they were systematically deprived of the most fundamental rights to which a state's nationals and citizens are entitled." *Id*. at *11. These arguments are "clearly inconsistent" with Plaintiffs' new position that they were Czechoslovakian nationals.

*Second*, this Court relied on Plaintiffs' asserted Hungarian nationality to reject application of the treaty exception. The Court explained that "[a]ll fourteen [Plaintiffs] were Hungarian nationals during World War II." *Simon I*, 812 F.3d at 134. And because of Plaintiffs' Hungarian nationality, the Court held that the Peace Treaty was not the exclusive remedy for Plaintiffs' wartime property losses. As the Court acknowledged, "the Supreme Court long ago suggested that a treaty of peace, by its very nature, may be seen to have the effect of finally settling wartime claims of one

17

signatory nation (and its nationals) against the other party." *Id.* at 138. But "Article 27 of the 1947 Treaty involves a fundamentally different situation," because it "secures a means by which one signatory's nationals (Hungarian Holocaust victims) can obtain relief against *their own* government." *Id.* Thus, the parties to the treaty—including Czechoslovakia—"could not render [the Article 27] means of recovery an exclusive one because they had no power to settle or waive the extra-treaty claims of another country's (Hungary's) nationals." *Id.*

The Court likewise relied on Plaintiffs' Hungarian nationality to reject Hungary's argument that binational agreements applying the 1947 Peace Treaty showed the treaty is the exclusive means of recovery. Adopting Plaintiffs' argument, the Court observed that "those bilateral agreements involved one nation's espousal and settlement of its own nationals' claims against another nation (Hungary)." *Id.* at 139. "Article 27," in contrast, involves "claims by *Hungarian nationals* against Hungary itself." *Id.* (emphasis added). Because no foreign nation (like Czechoslovakia) could espouse Hungarian nationals' Article 27 claims against Hungary, the Court "conclude[d] that the Allied Powers envisioned Article 27 as securing *at least* one means by which Hungarian victims could seek recovery against Hungary, but not to the exclusion of any alternate, extra-treaty actions." *Id.*

18

*Third*, Plaintiffs would receive an unfair advantage and impose an unfair detriment on Hungary if they were now permitted to reverse their position many years later. The district court first dismissed this case under the treaty exception in 2014. This Court revived it in *Simon I* based on Plaintiffs' assertion of Hungarian nationality. The case then continued for another six years of litigation at every level of the federal court system. It would not be fair to allow Plaintiffs to reverse themselves now, after they successfully argued Hungarian nationality in *Simon I*, merely because their incentives have changed.

### B.  Plaintiffs Failed to Meet the Required *Helmerich* "Valid Claim" Standard for FSIA Jurisdiction

Even if Plaintiffs could reverse course and now assert Czechoslovakian nationality, the district court applied the wrong standard to sustain the complaint. In *Helmerich*, the Supreme Court held that "the expropriation exception grants jurisdiction only where there is a *valid claim* that 'property' has been 'taken in violation of international law.'" 137 S. Ct. at 1318 (emphasis added; citation omitted). The district court applied a lower standard: It asked only whether it was "*plausible*" that Plaintiffs *might* be Czechoslovakian nationals after following a tortured "chain of

19

inferences" in Plaintiffs' favor. JA-1934 to -1941 (Dkt. 175) (emphasis added).[3]

*Helmerich* raised the bar to establish jurisdiction under the FSIA. The Supreme Court held that "the relevant factual allegations must make out a legally *valid claim* that … the relevant *property was taken* in a certain way (*in violation of international law*)." 137 S. Ct. at 1316 (emphasis added). That means the "facts bring the case within the scope of the expropriation exception only if they do show (and not just arguably show)" an international-law violation. *Id.* at 1324. And "[i]f a decision about the matter requires resolution of factual disputes, the court will have to resolve those disputes." *Id.* In short, there must actually *be* jurisdiction over a sovereign defendant. "A good argument to that effect is not sufficient." *Id.* at 1316.

In this respect, *Helmerich* requires more to satisfy the FSIA's jurisdictional prerequisites than is ordinarily required to survive dismissal at the pleading stage. A "plausible" or "arguable" claim on the merits may be enough to withstand a Rule 12(b)(6) motion in most civil actions.[4] But a

---

[3] *See also*, *e.g.*, JA-1916 (Dkt. 175) ("[P]laintiffs have plausibly established non-Hungarian nationality for nine … named plaintiffs.").

[4] For these purposes, "plausible" and "arguable" are synonyms. *See* Merriam Webster Online Dictionary, "Arguable," available at https://perma.cc/47CC-L5MB (last accessed Nov. 21, 2022) ("able to be plausibly or convincingly argued").

plausible or arguable claim to FSIA jurisdiction is not enough to strip a foreign state or instrumentality of sovereign immunity. *See Rukoro*, 976 F.3d at 225 ("Such allegations may satisfy a plausibility standard, but not a [*Helmerich*] valid argument standard.").

Applying these principles here, Plaintiffs had to allege and establish that they *were*—not just arguably were—Czechoslovakian nationals at the time of the takings. They plainly failed to do so. Indeed, the district court acknowledged that "further factual development may show that some of these named plaintiffs are Hungarian nationals as well, ultimately requiring further dismissals." JA-1916 (Dkt. 175). It likewise acknowledged that "any or all of these outcomes [on jurisdiction] may change as the case progresses." JA-1933 to -1934 (Dkt. 175).

This decision, allowing Plaintiffs' case to proceed without establishing a valid claim that jurisdiction *actually* exists, is incompatible with *Helmerich*. Denying a foreign nation's claim of sovereign immunity in the absence of an actual international-law violation ensnares sovereign defendants in burdensome, expensive litigation that causes "friction in our relations with those nations." *Helmerich*, 137 S. Ct. at 1322. That is exactly the opposite of what the FSIA is supposed to accomplish. *See, e.g.*, *Helmerich*, 137 S. Ct. at 1316-17 (FSIA's "basic objective [is] to free a foreign sovereign from *suit*"); *Process & Indus. Devs. Ltd. v. Federal Republic*

*of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020) ("[T]he Supreme Court has said that consideration of the merits is itself an infringement of sovereign immunity." (quotation and alteration omitted)).

To be sure, this Court also applied a plausibility standard to FSIA jurisdictional prerequisites in *Simon I*, which the court below quoted. *See* JA-1889 n.12 (Dkt. 175) (quoting *Simon I*, 812 F.3d at 147). But as the Second Circuit explained, "*Simon [I]* predates *Helmerich*, calling into question its use of a plausibility standard." *Rukoro*, 976 F.3d at 225. After *Helmerich*, this Court again applied a plausibility standard in *Schubarth v. Federal Republic of Germany*, 891 F.3d 392 (D.C. Cir. 2018), also citing and quoting *Simon I. See id.* at 400. But the sovereign defendants in *Schubarth* did not dispute use of that standard. Just the opposite: They assumed the plausibility test remained intact. *See Schubarth v. Federal Republic of Germany*, 2017 WL 11534689, at *33 (D.C. Cir. Oct. 10, 2017) (Principal Brief of Defendants-Appellees) ("[W]here [plaintiff's] allegations do not rise to the level of plausible, the Defendants do not have anything that needs to be refuted.").[5] The issue whether *Simon I*'s plausibility standard survived *Helmerich* is therefore one that "merely lurk[ed] in the

---

[5] Similarly, this Court cited *Schubarth*'s "plausible inferences" standard in *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020), and *Ivanenko v. Yanukovich*, 995 F.3d 232, 236 (D.C. Cir. 2021). But, like in *Schubarth*, the parties did not contest the standard nor did the Court address this issue.

22

record, neither brought to the attention of the court nor ruled upon, [and is] not to be considered as having been so decided as to constitute precedent[]." *Cooper Indus., Inc. v. Avall Servs., Inc.*, 543 U.S. 157, 170 (2004) (citation omitted).

### C.  Even under a Pre-*Helmerich* Standard, Plaintiffs' Allegations of Czechoslovakian Nationality Fail

1. Even under a pre-*Helmerich* plausibility standard, Plaintiffs have not shown they were Czechoslovakian nationals. The district court repeatedly recognized the deficiencies in Plaintiffs' jurisdictional allegations. It explained, for example, that Plaintiffs' "spectacularly unhelpful pleading" required a chain of inferences about nationality "longer than the Court should be assembling on its own." JA-1934 (Dkt. 175). But the court nonetheless denied Hungary's motion to dismiss, concluding that there *might* be jurisdiction over nine Plaintiffs' claims (even while allowing that all "these outcomes may change"). *Id.*

That was a misapplication of even the (incorrect) plausibility standard. Plausibility requires "more than a sheer possibility." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021). A complaint "stops short of the line between possibility and plausibility" where the allegations "are 'merely consistent with'" jurisdiction. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028,

1034-35 (D.C. Cir. 2022). And for any disputed facts, "plaintiffs … bear the burden of production." *Simon I*, 812 F.3d at 147.

2. Plaintiffs argue they were Czechoslovakian nationals because they were either born in or resided in territories (chiefly Ruthenia) that were part of Hungary until the end of World War I, when the territories became part of the newly formed Czechoslovakia, until they were later annexed back by Hungary before World War II. The district court distilled the following rights of citizenship within those territories from Plaintiffs' expert:

> ***Czechoslovakian citizenship***: If a "plaintiff's *parents* resided" continuously in the territory from January 1, 1910, the parents "would have been conferred Czechoslovakian citizenship on October 28, 1918. A plaintiff born to such parents would similarly have been a Czechoslovakian citizen at birth." JA-1933 (Dkt. 175).

> ***Hungarian citizenship***: "Hungarian citizenship was granted to inhabitants of Ruthenia who had lived there continuously from March 15, 1929 to March 15, 1939 and had been Hungarian citizens on July 26, 1921. Hungarian citizenship under these rules was granted also to wives and children under 24 years of age." JA-1931 (Dkt. 175) (citation and alternation omitted).[6]

---

[6] The court also noted that anti-Semitic laws enacted in the 1930s made it difficult for Jews to obtain "Hungarian citizenship either by naturalization or marriage." JA-1931 (Dkt. 175). But those laws—while certainly of great historical importance—are not relevant to the present analysis, because there is no allegation that any Plaintiff's citizenship depended on naturalization or marriage.

Applying these principles to the operative complaint, no Plaintiff alleged or established Czechoslovakian nationality at the time of the takings. Among other things, no plaintiff even alleged that his or her parents lived in the relevant territories from 1910-1918, so the predicate for Czechoslovakian citizenship did not exist for any Plaintiff. Beyond that, Plaintiffs have not pleaded (or established) that Czechoslovakian nationality was conferred automatically upon a right to citizenship.[7] Under Article 62 of the Treaty of Trianon, "persons who acquired rights of citizenship after January 1, 1910, in territory [including Ruthenia] transferred under the present Treaty … to the Czecho-Slovak State, will not acquire … Czecho-Slovak nationality without a permit from the … Czecho-Slovak State."[8] No Plaintiff alleges that his or her parents applied for or obtained a certificate, or that such a certificate was not required.

3. More specifically, the jurisdictional allegations as to each plaintiff were insufficient, as described below.

---

[7] "Nationality is a concept of international law; citizenship is not, but is a concept in the national law of many states. A citizen under national law is generally a national for purposes of international law, but in some states not all nationals are citizens." Restatement (Third) of Foreign Relations § 211(h).

[8] Treaty of Peace between the Allied and Associated Powers and Hungary and Protocol and Declaration, § VII art. 62 (June 4, 1920), registered as Law XXXIII in the 1921 Hungarian Code of Laws ("Trianon Treaty").

***The Lebovics sisters.*** As the district court observed, "Plaintiffs have not alleged the nationality of the Lebovics sisters, when or where they were born, how long they had lived in Ruthenia prior to its annexation, or the nationality of their parents." JA-1934 (Dkt. 175). That should have led to dismissal of their claims, especially because—as the court also recognized—"plaintiffs have already been afforded two opportunities to amend, and [] ample opportunity to provide supplemental jurisdictional evidence." *Id.*

Despite "this dearth of facts," the court allowed their claims to proceed, even while recognizing that this "require[d] a chain [of inferences] longer than the Court should be assembling on its own." *Id.* It did so by *assuming* unpled facts—*e.g.*, that the Lebovics sisters were born in Ruthenia, that they were born after 1918, that their parents resided continuously in Ruthenia between 1910 and 1918, and that their parents were not Hungarian citizens in 1921. But district courts are not supposed to make "inferences unsupported by facts." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018). All the complaint alleges is that these Plaintiffs were "raised in … Hungarian-annexed Ruthenia" during an unspecified time. JA-1934 (Dkt. 175). That allegation says nothing about, among other things, whether Plaintiffs' *parents* lived continuously in Ruthenia from 1910-1918, or applied for and received the Czechoslovakian nationality

26

permit required by Article 62 of the Trianon Treaty. These Plaintiffs have not met even the plausibility standard—let alone the correct "valid claim" standard under *Helmerich*.

***Magda.*** "As with the Lebovics sisters, plaintiffs fail to allege the nationality of Magda or her parents nor where her parents lived prior to 1928." JA-1935 to -1936 (Dkt. 175). Thus, as the district court acknowledged, "the complaint lacks sufficient facts to apply either the Czechoslovakian or Hungarian nationality laws as explained by plaintiffs." JA-1936 (Dkt. 175). That kind of observation normally tees up a dismissal. Instead, the district court made the unsupported leap that if Magda's family "seemingly lived in Ruthenia from at least 1928 through 1944, they *may* plausibly have lived there since 1910 and therefore would have obtained Czechoslovakian citizenship in 1918." JA-1936 (Dkt. 175) (emphasis added). Like all the other Plaintiffs, there is also no allegation that Magda's parents obtained the permit required by Article 62 of the Trianon Treaty for Czechoslovakian nationality.

***Yitzhak.*** The district court observed that Yitzhak's citizenship was "confounded by inconsistent factual allegations." JA-1937 (Dkt. 175) (current complaint: born in Prague in 1933; prior complaint: born in Slovakia in 1928). And again, Plaintiffs completely fail to allege when and where Yitzhak's *parents* were born or his parents' nationality. That should have

27

ended the matter. Yet, as with the other Plaintiffs, the court made an inferential leap unsupported by the factual allegations: It stated that because Yitzhak's parents allegedly resided in Czechoslovakian territory "leading up to 1939," it was "plausible" that the parents also continuously lived in the territory from 1910-1918. JA-1938 (Dkt. 175). There is no allegation that Yitzhak's parents satisfied Article 62 of the Trianon Treaty.

*Alex and Moshe.* For both Alex and Moshe, the district court noted that "[a]s with several other named plaintiffs, *no information is provided*" as to the nationality of either of their parents. JA-1938 to -1939 (Dkt. 175). The court nonetheless drew the unsupported inference that, because these Plaintiffs allege they were born and lived in Czechoslovakia in 1928, it is "plausible" that their parents lived there from 1910-1918. *Id*. Again, there is no indication that the parents of these Plaintiffs satisfied Article 62 of the Trianon Treaty.

## II.   The Treaty Exception of the FSIA Bars Suit by Czechoslovakian Nationals

If Plaintiffs were, as they now contend, Czechoslovakian nationals (or stateless) at the time of the takings, their claims would be barred by the FSIA's treaty exception, 28 U.S.C. § 1604. The treaty exception provides that FSIA jurisdiction is "[s]ubject to existing international agreements to which the United States [was] a party at the time of th[e FSIA's enactment]." *Id*. In *Simon I*, as explained above, this Court relied on Plaintiffs'

28

*Hungarian* nationality to hold that the treaty exception did not bar claims by Hungarian nationals against Hungary. *See* 812 F.3d at 138-39. The Court explained, though, that claims asserted by *non*-Hungarians "involve[] a fundamentally different situation." *Id*. at 138. If Plaintiffs were deemed Czechoslovakian nationals (or stateless) for purposes of the domestic-takings rule, that "fundamentally different situation" would require a fundamentally different result: Plaintiffs' lawsuit would be barred because the 1947 Peace Treaty resolved their claims.

The treaty established peaceful relations between Hungary and the Allied Powers, including the United States and Czechoslovakia. *See generally* 61 Stat. 2065. There is no dispute that the 1947 Peace Treaty is an international agreement to which the United States was a party when the FSIA was enacted. *See Simon I*, 812 F.3d at 136. Accordingly, under the treaty exception, "[i]f there is a conflict between the FSIA and [the treaty] regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 601 (D.C. Cir. 2013) (citation omitted).

A. **The Text of the 1947 Peace Treaty Extinguishes Plaintiffs' Claims**

"The interpretation of a treaty … begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506 (2008). The text of the 1947 Peace Treaty shows

it is the exclusive means for non-Hungarian claimants to recover from Hungary for wartime property losses.

The Preamble states that the treaty "*will settle* questions still outstanding as a result of the events hereinbefore recited [including World War II] and form the basis of friendly relations." 1947 Peace Treaty, Preamble (emphasis added). The body of the treaty then specifically addresses the same losses Plaintiffs allege in this case, for property taken by Hungary during the war.

If Plaintiffs were not Hungarian nationals at the time of the takings, then their property losses would fall within Article 26 of the treaty, which addresses property taken from Czechoslovakian and other United Nations nationals.[9] Article 26 defines United Nations nationals broadly to include not only "individuals who are nationals of any of the United Nations," but also "all individuals" who "under the laws in force in Hungary during the war, have been treated as enemy." 1947 Peace Treaty art. 26(9). So if Plaintiffs had been rendered stateless during the war, they would be United Nations nationals for purposes of this treaty provision, and their property-loss claims would be governed by Article 26.

---

[9] "Czechoslovakia was an original Member of the United Nations from 24 October 1945," over a year before the 1947 Peace Treaty entered into force. *See* "Czechoslovakia and Successor States: Czech Republic, Slovakia," United Nations, available at https://perma.cc/7WRW-Y5WU (last accessed Nov. 20, 2022).

Article 26 establishes an exhaustive procedure for the "return" of "all property in Hungary of the United Nations and their nationals." *Id.* art. 26(1). It requires Hungary to "nullify all measures, including seizures, sequestration or control, taken by it against United Nations property between September 1, 1939 and the coming into force of the present Treaty." *Id.* art. 26(2). It likewise requires Hungary to "invalidate transfers involving property, rights and interests of any description belonging to United Nations nationals, where such transfers resulted from force or duress exerted by Axis Governments … during the war." *Id.* art. 26(3). And "[i]n the case of Czechoslovak nationals," in particular, it requires Hungary to invalidate "transfers" resulting from "measures taken under discriminatory internal legislation by the Hungarian Government … in Czechoslovak territory annexed by Hungary." *Id.* "In cases where property cannot be returned," a "United Nations national … shall receive from the Hungarian Government compensation in Hungarian currency to the extent of two-thirds" of the property's value. *Id.* art. 26(4)(a).

Claimants seeking compensation from Hungary for Article 26 losses cannot resort to another nation's courts. Rather, "application shall be made *to the Hungarian authorities* …." *Id.* art. 26(2) (emphasis added). No alternative procedure may be employed except by mutual agreement of

31

the interested parties: "The owner of the property concerned and the Hungarian government *may agree* upon arrangements in lieu of the provisions of this article." *Id.* art. 26(8) (emphasis added). Hungary has not agreed to resolve these claims by litigation in U.S. courts.[10]

The treaty also provides an exclusive mechanism for resolving disputes over property rights addressed by Article 26. It states: "*Any disputes which may arise in connection with Articles 24, 25, and 26 … shall be referred to a Conciliation Commission composed of an equal number of representatives of the United Nations Government concerned and of the Hungarian Government.*" *Id.* art. 35(1) (emphasis added). When a dispute occurs, "[t]he decision of the majority of the members of the Commission"—with a tie-breaking "third member" added, if necessary—"shall be … definitive and binding." *Id.* art. 35(2). "Any disputes" means all disputes. There is no alternative procedure by which private parties may bypass the Conciliation Commission and present claims for Article 26 losses directly to U.S. courts.

---

[10] Article 24 of the treaty imposes another, related obligation on Hungary. It requires Hungary to return "property removed from the territory of any of the United Nations." *Id.* art. 24(1). Like Article 26, it says "[c]laims for the restitution of property shall be presented *to the Hungarian Government* …." *Id.* art. 24(7) (emphasis added).

### B. Under Centuries of International Law, Peace Treaties Extinguish All War-Related Claims

In addition to its text, the very nature of the 1947 Peace Treaty establishes it as the exclusive means to assert claims against Hungary for wartime property losses. As recognized since the Founding, a peace treaty extinguishes all war-related claims between treaty parties and their nationals. Under centuries of international law: (1) war-related claims of individuals belong to their respective governments, and those governments have untrammeled authority to settle private claims; and (2) all war-related claims are extinguished by peace settlements. This longstanding rule is necessary to allow once-bellicose nations to put past conflicts behind them and establish peaceful relations.

There is no doubt that the parties to the 1947 Peace Treaty—including Czechoslovakia—possessed the "absolute power" to espouse and "assert the private claims of [their nationals] against another sovereign," like Hungary. *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1523 (D.C. Cir. 1984) (Scalia, J.) (citing L. Henkin, Foreign Affairs and the Constitution 262-63 (1972); Restatement (Second) of Foreign Relations Law of the United States at § 212)). And with the power to espouse a private claim comes the power to settle it. "As one treatise writer puts it, international agreements settling claims by nationals of one state against

the government of another 'are established international practice reflecting traditional international theory.'" *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981) (quoting Henkin, at 262). This is because "in international law the individual and his debt have no independent existence: his claim is only a right of his government against that of the debtor." Henkin, at 262.[11]

And, as this Court has explained, "[f]inal settlement between sovereigns wipes out the underlying private debt, and releases the defendant sovereign from all obligation except such as the settlement agreement may provide." *Asociacion de Reclamantes*, 735 F.2d at 1523 (citation omitted; cleaned up); *see also Simon I*, 812 F.3d at 138 ("[A] treaty of peace, by its very nature, may be seen to have the effect of finally settling the wartime

---

[11] *See also* Restatement (Third) of Foreign Relations, § 902 cmt. (h)(i) (1987) ("[A] state's claim for a violation that caused injury to rights or interests of private persons is a claim of the state and is under the state's control. The state may determine what individual remedies to pursue, may abandon the claim, or settle it."); Rudolf Dolzer, *The Settlement of War-Related Claims: Does International Law Recognize a Victim's Private Right of Action? Lessons after 1945*, 20 BERKELEY J. INT'L L. 296, 338 (2002) ("The practice of subsuming war-related claims within the process of reparation, and thus not allowing the individual resolution of such claims by national courts, had a twofold-basis. First, it was consistent with the broader classical rules of international law under which aliens must have their claims, whether arising from wartime or peacetime events, protected by their home countries. Second, it reflected the practical necessities of peacemaking, as the presence of claims controlled by individuals would further complicate the always difficult process of international peace negotiations.").

claims of one signatory nation (and its nationals) against the other party." (citation omitted)); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 63 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) ("Once an international settlement agreement is finalized, the private claim becomes a 'claim of the state and is under the state's control.'" (citation omitted)).

This has been the rule of international law for centuries. Just years after the Founding, Justice Chase explained in *Ware v. Hylton*, 3 U.S. 199 (1796), "the treaty of peace *abolishes the subject of the war*, and … after peace is concluded, neither the matter in dispute, nor the *conduct* of either party, *during the war, can ever be revived, or brought into contest again*." *Id.* at 230 (emphasis added). Further, "*all* violencies, injuries, or *damages* sustained by the government, or people of either, during the war, are *buried in oblivion*." *Id.* (emphasis added).

In the 1947 Peace Treaty, Czechoslovakia and other treaty parties espoused and settled the claims of their nationals against Hungary for wartime property losses. The treaty therefore "provides a *complete defense*" for Hungary in "any action" by any Czechoslovakian or other United Nations national alleging deprivations of property during the war. *Asociacion de Reclamantes*, 735 F.2d at 1523 (emphasis added).

This would be so even if the 1947 Peace Treaty contained no language specifically addressing private claims or suggesting that treaty remedies

35

are exclusive. As Justice Chase stated, "all th[e]se things are implied by the very treaty of peace; and therefore not necessary to be expressed." *Ware*, 3 U.S. at 230. For war-related claims against a sovereign to alter the default assumption and survive a peace treaty, the agreement must expressly *preserve* them. *See Hwang Geum Joo v. Japan*, 413 F.3d 45, 51 (D.C. Cir. 2005) ("*[E]xcept as an agreement might provide otherwise*, international claim settlements generally wipe out the underlying private debt, terminating any recourse under domestic law as well." (emphasis added; citation omitted)); *Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 273-74 (D.N.J. 1999). As one commentator put it, "individual grievances are settled by the treaty of peace." Edwin Borchard, <u>The Diplomatic Protection of Citizens Abroad</u> 251 (Banks Law Publishing 1915).

## III. Plaintiffs Have Not Satisfied the Expropriation Exception's Property Nexus Requirement

The complaint must be dismissed on an independent ground as well: No Plaintiff met the expropriation exception's property nexus requirement as to either Hungary or MÁV. The expropriation exception requires, in addition to an international-law violation, that the sovereign defendant engage in commercial activity in the United States and have a nexus to the expropriated property. *See* 28 U.S.C. § 1605(a)(3). Because Plaintiffs have not shown a property nexus for either defendant, their claims could

not proceed even if Hungary or MÁV had engaged in commercial activity in this country (they did not, *see infra* Point IV).

The district court concluded otherwise because it made two reversible errors. *First*, it did not apply the valid-claim standard laid down by the Supreme Court in *Helmerich*, which Plaintiffs cannot meet. *Second*, even under a pre-*Helmerich* standard, the district court misapplied the test. Defendants showed, and the district court acknowledged, that no money in the United States or in MÁV's possession could be traced to property expropriated from any of these Plaintiffs. That means the expropriation exception does not apply.

**A. Plaintiffs Did Not Make Out a Valid Claim That Hungary or MÁV Possess Property Expropriated from Plaintiffs or Property Exchanged for It**

"The nexus requirement differs somewhat for claims against the foreign state itself (*e.g.*, Hungary) as compared with claims against an agency or instrumentality of the foreign state (*e.g.*, MÁV)." *Simon I*, 812 F.3d at 146. For Hungary, "the question is whether the 'property [expropriated from Plaintiffs] or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by [Hungary].'" *Id.* (quoting 28 U.S.C. § 1605(a)(3)). For MÁV, "the question is whether the 'property [expropriated from Plaintiffs] or any property exchanged for such property is owned or operated by

[MÁV] and [MÁV] is engaged in a commercial activity in the United States.'" *Id.* (quoting 28 U.S.C. § 1605(a)(3)). Plaintiffs had to make this showing as of 2010, when the complaint was filed—some 65 years after the war ended. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (subject-matter jurisdiction is determined by "the state of things at the time of the action brought").

Plaintiffs do not contend that Hungary or MÁV possesses the very property taken from them during World War II. Rather, they have attempted to meet only the alternative prong of the exception for "property exchanged for such property." Under *Helmerich*, Plaintiffs had to make out a valid claim that this prong is satisfied for each defendant.[12] They had to show, that is, that the property they rely on to satisfy the nexus "was indeed" exchanged for the property they allege was taken from each of them. *Helmerich*, 137 S. Ct. at 1316-17. An argument that property merely *might* have been exchanged for theirs is insufficient.

No Plaintiff established a valid claim that he or she met the property nexus. Plaintiffs simply alleged "that the Hungarian defendants liquidated the stolen property, mixed the resulting funds with their general

---

[12] "While the Supreme Court in *Helmerich* addressed only the 'property taken in violation of international law' element of the expropriation exception, … there is no reason to read the decision as applying the valid argument standard to only that element, rather than the entire exception." *Rukoro*, 976 F.3d at 225.

revenues, and devoted the proceeds to funding various governmental and commercial operations." *Simon I*, 812 F.3d at 147. The only evidence Plaintiffs submitted were two public sources (a court decision and museum archives) recognizing the uncontested fact that Hungary nationalized "Jewish property" during the war. *Simon*, 443 F. Supp. 3d at 104. Plaintiffs made no attempt, however, to show how any property in the United States or possessed by MÁV is related to the particular property expropriated from them.

The expropriation exception does not reach *all* property (or money) in a sovereign's possession merely because, decades earlier, the sovereign expropriated something. It is concerned with specific property—"*that property* [taken from a plaintiff in violation of international law] or any property exchanged for *such* property." 28 U.S.C. § 1605(a)(3) (emphasis added). The statutory language "exchanged for such property" means what it says—property traceable to the *same* property expropriated from the plaintiff. As the Supreme Court recently explained, "the adjective 'such' means 'of the kind or degree already described or implied.'" *Culbertson v. Berryhill*, __ U.S. __, 139 S. Ct. 517, 522 (2019) (alterations adopted; citation omitted). Thus, in *King v. Burwell*, the Supreme Court held that

"[b]y using the phrase 'such Exchange,' Section 18041 instructs the Secretary to establish and operate the *same* Exchange that the State was directed to establish under Section 18031." 576 U.S. 473, 487 (2015).

The only property "already described" or "just mentioned" in Section 1605(a)(3) is the property taken from a plaintiff in violation of international law. So each Plaintiff must establish a valid claim that property used by Hungary in the United States or possessed by MÁV was exchanged for the same property taken from him or her. Plaintiffs never even attempted to make this showing, so the complaint must be dismissed.

The Second Circuit recently addressed this identical issue. In *Rukoro*, like this case, the plaintiffs sought to hold a sovereign nation (there, Germany) accountable in a U.S. court for "enslavement and genocide" that occurred many decades earlier in another country (present-day Namibia). 976 F.3d at 221. Like in this case, the plaintiffs there asserted jurisdiction under the FSIA's expropriation exception and alleged that Germany "derived at least a portion of its wealth from property expropriated from [them]." *Id.* at 222. According to the plaintiffs' expert, "monies so derived may be reasonably presumed to have gone into the general coffers of the German official banking system, and since money is fungible, … [were] later used [by Germany] to purchase various properties in New York." *Id.* at 225 (quotation and alteration omitted).

40

The Second Circuit found "plaintiffs' allegations insufficient to trace the proceeds from property expropriated more than a century ago to present-day property owned by Germany in New York." *Id.* at 222. In language equally applicable here, the court held, "[t]he conclusory allegations in the amended complaint simply do not suffice to make a valid argument that property converted into currency and commingled with other monies in Germany's general treasury account can be traced to the purchase of property in New York decades later." *Id.* at 225.

The Second Circuit's decision in *Kuo v. Gov't of Taiwan*, 802 F. App'x 594 (2d Cir. 2020), is also instructive. The property at issue there—a $7.5 million home—was allegedly expropriated by Taiwan and sold to a developer in 2009. *See id.* at 596. The Kuos attempted to meet the property nexus by alleging that Taiwan purchased goods from the United States and owned property here. *See id.* The Second Circuit held that "mere[] speculation" like this is insufficient to establish FSIA jurisdiction. *Id.* at 597. "Taiwan does billions of dollars in trade with the United States" and uses its general revenue for other purposes that do not involve the United States at all. *Id.* Because the Kuos did not "show that [Taiwan's U.S. properties] were specifically purchased using proceeds from the sale of Kohn Yu's property," there was "simply insufficient evidence" to satisfy the nexus requirement. *Id.* So too here.

41

## B. Even under a Pre-*Helmerich* Standard, the Complaint Must Be Dismissed Because Defendants Showed That No Property in Their Possession Can Be Traced to Property Expropriated from Plaintiffs

Plaintiffs did not meet the pre-*Helmerich* standard either. In *Simon I*, before *Helmerich*, this Court held "only" that Plaintiffs' allegations regarding the property nexus "are not so implausible as to permit resolution *on the pleadings alone.*" *Simon I*, 812 F.3d at 147 (emphasis added; citation omitted). As the Court explained, though, if Hungary contested the factual basis for jurisdiction, Plaintiffs would have to *prove* it: "[T]he plaintiffs ultimately 'may or may not be able to prove the point.'" *Id.* (citation omitted). And the Court made clear that, to prove jurisdiction, Plaintiffs could not simply rest on the allegations in their complaint. They would have to produce evidence: "Upon any factual challenge by the Hungarian defendants … the plaintiffs *will bear the burden of production*, and the defendants will bear the burden of persuasion to 'establish the absence of the factual basis by a preponderance of the evidence.'" *Id.* (emphasis added; citation omitted).

Hungary has asserted a factual challenge to jurisdiction. That means each Plaintiff had to produce evidence that property *exchanged for his or her property* is present in the United States in connection with a commercial activity or is possessed by MÁV. Plaintiffs cannot rely on property derived from other sources. They cannot, for example, point to property (or

42

money exchanged for property) taken from any non-party to this case, including putative class members.[13] Jurisdiction must be established for each individual Plaintiff regarding property taken specifically from that Plaintiff. *See Alperin v. Vatican Bank*, 2007 WL 4570674, at *8 (N.D. Cal. Dec. 27, 2007), *aff'd*, 360 F. App'x 847 (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010) ("Plaintiffs have not alleged, however, that *their* property was exchanged for gold and then transferred to the United States, only that an unidentified 'portion' of the Ustasha Treasury was transferred.").

"The 'property tracing' feature of the FSIA severely limits the use of this alternative violation of international law provision of the FSIA." Exceptions to sovereign immunity—Violations of international law, 2 International Business Transactions § 34:30 (3d ed.); *see also, e.g.*, *Freund v. Republic of France*, 592 F. Supp. 2d 540, 560 (S.D.N.Y. 2008), *aff'd sub nom. Freund v. Société Nationale des Chemins de fer Français*, 391 F.

---

[13] Property of absent putative class members, like property of other non-parties, is irrelevant to whether the district court has subject matter jurisdiction over the Named Plaintiffs' claims. *See Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 297 (D.C. Cir. 2020) ("By contrast, putative class members—at issue in this case—are *always* treated as nonparties."); *Pruell v. Caritas Christi*, 645 F.3d 81, 83-84 (1st Cir. 2011) ("The usual rule in class actions is that to establish subject matter jurisdiction one looks only to the named plaintiffs and their claims." (citing 5 W. Moore et al., *Moore's Federal Practice* § 23.63[1][b] (3d ed. 2011)).

App'x 939 (2d Cir. 2010) (requiring "traceability"). This is why, even before *Helmerich*, courts rejected arguments that "property *might* be within the United States" as "too speculative to support the requisite jurisdictional nexus." *Alperin*, 2007 WL 4570674, at *8; *see also, e.g.*, *Freund*, 592 F. Supp. 2d at 559-60 ("allegations that property that was allegedly taken over sixty years ago is presently owned or operated by SNCF" were "insufficient to satisfy [p]laintiffs' burden of going forward with evidence" (quotation marks and citation omitted)).

Plaintiffs in this case did not meet their burden to produce evidence tracing property in the United States or possessed by MÁV to property expropriated from them during World War II. They submitted no evidence regarding *their* property in particular, as distinct from other property expropriated from non-parties. Beyond that, Plaintiffs' evidence and allegations concern events at or near the time of the takings—ignoring the intervening sixty-five years until they filed suit.[14] There was not even an allegation (let alone evidence) purporting to trace property possessed by Defendants in 2010, when the lawsuit was filed, to property expropriated from the Named Plaintiffs more than six decades earlier.

---

[14] *See Simon*, 443 F. Supp. 3d at 104 (quoting SAC ¶ 97) (Plaintiffs alleged that Defendants "'liquidated stolen property,'" "'mixed'" the proceeds with "'their general revenues,'" and used them to "'fund[] various governmental commercial operations.'").

44

Hungary, on the other hand, did produce evidence. It showed that no property in the United States or possessed by MÁV can be traced to *any* property taken during World War II, let alone property taken specifically from these Plaintiffs. To establish this fact, Hungary submitted "depositions of three experienced scholars with knowledge of Hungarian state archival records relating to the Holocaust." *Simon*, 443 F. Supp. 3d at 104. They explained that it would be "impossible to trace … ongoing possession of the plaintiffs' expropriated property." *Id.* at 105. Plaintiffs did not contest this evidence or the scholars' ultimate conclusions.

This is not surprising, given the countless interceding events between the expropriations and the filing of this lawsuit. As this Court explained, "[m]uch of the property confiscated by Hungary from its nationals during the War was lost or destroyed in the conflict." *Simon I*, 812 F.3d at 139. Among other things, "[i]n the fall and winter of 1944-45, as the prospect of Germany's defeat loomed larger, the Hungarian Government, at the direction of the Nazis, loaded … Jewish property onto a train bound for Germany." *Rosner v. United States*, 231 F. Supp. 2d 1202, 1204-05 (S.D. Fla. 2002). "The lengthy train," known as the "Gold Train," "made its way from Hungary into Austria, but never made it to German territory" because it was intercepted by the U.S. Army. *Id.* Other expropriated property was taken by Nazi Germany, as Plaintiffs acknowledge. JA-263 (Dkt. 118); *see*

45

*also Simon I*, 812 F.3d at 144. And Plaintiffs allege that still other property was sold by Hungary, "co-mingled with other Hungarian government revenues," JA-265 to -266 (Dkt. 118), and used "to finance Hungary's war effort," *Simon I*, 812 F.3d at 143, meaning it would not currently be in Hungary's or MÁV's possession.

After the war, Hungary's fisc experienced vast upheavals. Following occupation by Nazi Germany in 1944, Hungary was "liberated" and then occupied by the Soviet Union. *See Simon I*, 812 F.3d at 153. During Soviet occupation, which lasted until 1989, a great deal of private property was nationalized, wiping out much of the remaining private property holdings of Hungarian Jews and non-Jews alike. *See* JA-330 to -331 (Dkt. 120-25 ¶¶ 80-83); *Simon I*, 812 F.3d at 152-53; *Burger-Fischer*, 65 F. Supp. 2d at 264-65 (describing conditions in post-World War II Europe).

In the 1990s, after the fall of the Communist regime in Hungary, the Hungarian government enacted compensation statutes, making funds available to current and former Hungarian nationals who lost property or suffered injuries during World War II and the Communist era. JA-167 to -168 (Dkt. 22-2 ¶¶ 23-25). These laws were intended to compensate the Jewish population, among others, for the wrongful taking of their property and for personal injuries during and after the war. *Id.* Hungary also transferred to a Jewish foundation other property that had been confiscated

46

from Jewish persons but could not be returned to a rightful owner. JA-168 (Dkt. 22-2 ¶ 26).

What's more, the Hungarian government has entered into countless financial transactions in the decades between World War II and the filing of this action. Like other sovereign nations, Hungary expends vast sums of money on governmental purposes that are not exchanges for property or money, so there is no basis to presume that funds Hungary possessed during World War II remain in its coffers today. Hungary also raises large sums of money through taxes, public debt, and other means. And, like other nations, Hungary's central bank controls the circulation of its national currency, the forint—which was introduced in 1946, after the expropriations alleged here. The massive scale of these transactions, raising and expending funds at levels commensurate with the needs of a modern nation, drowns out any conceivable connection between the property Hungary possesses now and an expropriation of these individual Plaintiffs' property in the 1940s.

The district court did not find otherwise. It acknowledged that Hungary's evidence "confirm[ed] the difficulty of tracing individual paths of exchange." *Simon*, 443 F. Supp. 3d at 105. But the court believed this "hurts rather than helps the defendants, since," in the court's view, "the burden rests on the defendants to show that the expropriated property never

47

reached Hungary's treasury or was otherwise disposed of …." *Id.* That not only gets the burdens wrong, it asks the wrong question. The issue is whether any property *is* traceable to—"exchanged for"—the specific property taken from the Named Plaintiffs. And, as this Court explained, "the *plaintiffs* … bear the burden of production," *Simon I*, 812 F.3d at 147, so Plaintiffs had to submit evidence that this tracing could be done. They did not, so no burden ever shifted to Hungary. But even if it had, no one disputed Hungary's evidence showing that tracing would be impossible, so the complaint must be dismissed.

The contrary view—that *all* sovereign wealth derives from a historic expropriation unless the sovereign can prove it doesn't—is incompatible with the FSIA's text and purpose. United States courts are not "international courts of claims, open to all comers to litigate any dispute [from decades earlier] which any private party may have with a foreign state anywhere in the world." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 490 (1983) (citation omitted; alterations adopted). Treating all sovereign property as the fruit of expropriations from past generations would also make the United States vulnerable to similar treatment abroad. Other nations might "'reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.'" *Philipp*, 141 S. Ct.

at 714 (quoting *Helmerich*, 137 S. Ct. at 1322). The United States has already stated, in a prior amicus brief in this case, that "deeming allegations that the Republic of Hungary seized and liquidated property abroad and commingled it with general revenues in its treasury abroad many decades ago to be sufficient to treat any state-owned property in the United States as 'exchanged' for expropriated property would expand the expropriation exception far beyond its intended limits." Amicus Curiae Brief for United States at 23, *Simon v. Republic of Hungary*, No.17-7146 (D.C. Cir. June 1, 2018), Document #1733875. The Court should instead apply the FSIA in keeping with its text and purpose and dismiss the complaint.

## IV. Hungary and MÁV Do Not Engage in Commercial Activity in the United States

The complaint also must be dismissed because Plaintiffs did not satisfy the commercial-activity requirement for either Hungary or MÁV. 28 U.S.C. § 1605(a)(3).

### A. The District Court Erred in Concluding That Plaintiffs Satisfied the Commercial-Activity Requirement as to Hungary

The district court found that Hungary engaged in commercial activity in the United States by: (i) acquiring military equipment through the U.S. government's Foreign Military Sales Program (FMSP), which is available solely to foreign nations approved by the President; and (ii) issuing bonds,

which a non-party government agency sold and paid interest on in the United States. Both rulings were incorrect.

1. This Court has already squarely held that "participating in the FMS program" is "not commercial activit[y] under the [FSIA]." *Heroth v. Kingdom of Saudi Arabia*, 331 F. App'x 1, 2 (D.C. Cir. 2009) (per curiam).[15] Without even addressing this decision, the district court incorrectly reached the opposite conclusion—that Hungary's participation in the FMSP "constitutes 'commercial activity.'" *Simon*, 443 F. Supp. 3d at 109-10.[16]

"[A] foreign state engages in commercial activity for purposes of the restrictive theory only where it acts in the manner of a *private player* within the market." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (emphasis added; quotation omitted); *see also* 28 U.S.C. § 1603(d). The FMSP is not available to private parties. It "is the U.S. Government's program

---

[15] This unpublished, directly relevant decision is citable as precedent under Circuit Rule 32.1(b)(1)(B).

[16] While the district court cited this Court's *Heroth* decision in an "aff'd" clause (*Simon*, 443 F. Supp. 3d at 110), it failed to acknowledge that decision when holding that Hungary's participation in the FMSP constitutes commercial activity. Instead, the district court discussed only the *lower court's Heroth* decision, which it inaccurately described as dicta and discounted. *Id.*

for transferring defense articles, services, and training to [its] international partners and international organizations."[17] "The President designates countries and international organizations eligible to participate in FMS." FMS FAQ. Once designated, "[e]ligible countries may purchase defense articles and services with their own funds or with funds provided through U.S. Government-sponsored assistance programs." *Id.* "The Department of State approves individual programs on a case-by-case basis." *Id.*

In *Heroth*, the plaintiffs made exactly the same argument as Plaintiffs here: That a foreign sovereign's participation in the FMSP constitutes commercial activity for purposes of the FSIA.[18] This Court rejected the argument, holding that military transactions under the FMSP "are quintessentially sovereign activities." *Heroth*, 331 F. App'x at 3. "'When two governments deal directly with each other *as governments,* even when the subject matter may relate to the commercial activities of its citizens or

---

[17] Defense Security Cooperation Agency, *Foreign Military Sales FAQ*, available at https://perma.cc/E673-YHH6 (last accessed Nov. 21, 2022) ("FMS FAQ"); *see also* 22 U.S.C. § 2753(a) (limiting FMSP participation to designated "countr[ies] or international organization[s]").

[18] *Compare Simon*, 443 F. Supp. 3d at 109-10 ("Hungary purchased military equipment from the U.S. government under the U.S. Government's foreign military sales program."), *with Heroth*, 331 F. App'x at 3 ("Saudi Arabia contracted with the United States for military training services under the [FMSP].").

governmental entities, … those dealings are not akin to that of participants in the marketplace.'" *Id.* (quoting *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994)); *see also Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, __ F. 4th __, 2022 WL 16936267, at *5-8 (4th Cir. Nov. 15, 2022) (concluding that a foreign sovereign's participation in the FMSP involved "conduct peculiar to sovereigns," and it "therefore was not engaged in 'commercial activity'" under the FSIA, even though it involved the purchase and sale of goods) (citations omitted).

2. The district court likewise erred by concluding that the commercial nexus is satisfied because Hungary "issued the bonds" that were sold in the United States by a third party. *Simon*, 443 F. Supp. 3d at 107-09. This ruling conflated the act of *issuing* bonds (done by Hungary) outside the United States with the commercial activity of *marketing and paying interest* on bonds (done by a different entity) in the United States.

In finding the commercial-activity requirement was satisfied, the district court focused on Hungary's issuance of bonds—bonds that were marketed, sold, and managed in the United States by a separate juridical entity known as ÁKK. The court observed that the bonds were "clearly offered by Hungary," that "Hungary … issued the bonds in question," and that the "debt was Hungary's." *Simon*, 443 F. Supp. 3d at 108-09.

52

But the question is not who issued the bonds—Hungary did. The question is who engaged in "commercial activity in the United States" in connection with property exchanged for expropriated property. 28 U.S.C. § 1605(a)(3). The bonds themselves are not property exchanged for property expropriated from Plaintiffs. They were issued by Hungary, as part of a multi-billion-dollar international debt offering. The only conceivably relevant property in the United States would be interest paid on the bonds to U.S. holders, and the relevant commercial activity in the United States would be the payment of that interest or, perhaps, marketing the bonds to investors. If any entity engaged in commercial activity in the United States in connection with that property, it was ÁKK, a Hungarian government instrumentality that manages state debt. The record shows unequivocally that ÁKK (not Hungary) marketed the bonds and made interest payments from its own account. *See* JA-1156, -1159, -1162 to -1163, -1165 to -1170 (Dkt. 147).[19]

---

[19] Because ÁKK is a separate juridical entity, its conduct cannot be attributed to Hungary. *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-27 (1983) ("*Bancec*") ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."). The district court did not find otherwise; it expressly declined to reach this issue. *See Simon*, 443 F. Supp. 3d at 109 n.13.

53

### B. The District Court Erred in Concluding That Plaintiffs Satisfied the Commercial-Activity Requirement as to MÁV

The district court also erred by finding that MÁV engages in commercial activity in the United States, based entirely on the actions of a separate entity, MÁV-START. *Simon*, 443 F. Supp. 3d at 112-15. Plaintiffs "allege MÁV engage[d] in commercial activity in the United States by 'selling tickets, booking reservations, and conducting similar business.'" *Id.* at 113 (quoting SAC ¶ 99). But the uncontested evidence showed MÁV does not do any of those things in the United States—nor, for that matter, even in Hungary.

In 2007, years before Plaintiffs filed their complaint, MÁV's public passenger rail services were taken over by a newly established, separate legal entity called MÁV-START. JA-818 (Dkt. 138-2). Since then, MÁV-START (not MÁV) has been responsible for passenger operations, including reservations and ticketing. MÁV, in contrast, is responsible for maintaining Hungary's railways—work it performs exclusively within Hungary. MÁV provides no services to passengers, nor does it take reservations or sell tickets for the passenger trains it does not operate. Those things are done by MÁV-START, which is not a defendant here. *Id.*

MÁV cannot be subjected to the jurisdiction of a U.S. court based on the activities of MÁV-START, a different entity. Like other "duly created

54

instrumentalities of a foreign state," MÁV-START is to be "accorded a presumption of independent status." *Bancec*, 462 U.S. at 627; *see also GSS Grp. Ltd. v. Nat. Port Auth.*, 680 F.3d 805, 814 (D.C. Cir. 2012) ("In other words, state-owned firms generally are not liable for their government's actions." (citing *Bancec*, 462 U.S. at 626-27)). This presumption may be overcome only if a plaintiff demonstrates that an instrumentality "is so extensively controlled by [a sovereign] that a relationship of principal and agent is created." *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) (quoting *Bancec*, 462 U.S. at 629)).[20]

As this Court has explained, "[a]t a minimum, … we can confidently state that the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making   appointments   to   the   subsidiary's   Board   of   Directors."

---

[20] This standard also applies to the issue of jurisdiction over Hungary's instrumentality, MÁV, based on the actions of MÁV-START. *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 201-02 (2d Cir. 2016); *Simon*, 443 F. Supp. 3d at 113.

*Transamerica Leasing*, 200 F.3d at 849. The district court's conclusions regarding the relationship between MÁV and MÁV-START do not meet this exacting standard.

The district court articulated five grounds for finding an agency relationship: (1) MÁV-START was a "wholly owned subsidiary of MÁV"; (2) the corporate group's website design implies that they are "closely related"; (3) "MÁV-START is financially dependent on MÁV"; (4) MÁV-START "coordinat[es] with MÁV" because their operations relate generally to the Hungarian railway; and (5) a member of MÁV's board of directors helped oversee a restructuring that involved MÁV-START. *Simon*, 443 F. Supp. 3d at 115-16.

*First*, MÁV-START's status as a wholly owned subsidiary of MÁV is not a valid basis for imputing agency. This Court specifically stated in *Transamerica Leasing* that an agency relationship is not created "by owning a majority of a corporation's stock." 200 F.3d at 849.

*Second*, the district court's reliance on the design of a website for *MÁV Group*—not MÁV—was both factually and legally unfounded. The district court conflated *MÁV* (a discrete instrumentality) with *MÁV Group* (a group of affiliated entities). The court incorrectly referred to MÁV Group's website as "MÁV's website," noting that "MÁV *Group* is prominently identified in the right-hand corner of the page." *Simon*, 443 F. Supp. 3d at 115

56

(emphasis added). As indicated in Plaintiffs' own brief, "*30 companies belong[] to the MÁV Group*." Plaintiffs' Memorandum of Law in Opposition to Defendants Hungary and MÁV's Third Motion to Dismiss, Dkt. 148 at 34 n.17 (D.D.C. Nov. 4, 2019) (emphasis added). The MÁV Group website the court relied on relates to all thirty. But only one of those companies—MÁV—is a defendant here.

Beyond conflating MÁV and MÁV Group, the district court offered no support for its unusual "corporate group website" theory for an agency finding. It simply assumed that the "coordinated manner" in which those companies were depicted on a website was evidence of an agency relationship. *Simon*, 443 F. Supp. 3d at 115.

*Third*, the district court's conclusion that "MÁV-START is financially dependent on MÁV" is also flawed factually and legally. The court again conflated MÁV and MÁV Group. *See id.* (citing report that MÁV-START's financial position is related to "MÁV *Group's* financial position" (emphasis added)). The lower court's ruling also conflicts with this Court's decision in *Transamerica Leasing*. The district court found an agency relationship, in part, because "MÁV-START's financial stability depended on funding from the Hungarian state." *Id.* This Court rejected a similar conclusion with respect to Venezuela's funding of an instrumentality, noting that such behavior is "a normal aspect of the relation between a government

and a government-owned corporation." *Transamerica Leasing*, 200 F.3d at 852. And here, the district court relied on *Hungary's* funding of MÁV-START to find an agency relationship between *MÁV* and MÁV-START, once again conflating distinct entities.

*Fourth*, the district court's observation that MÁV-START and MÁV "coordinat[e]" and "cooperat[e]" in activities related to the Hungarian railway is beside the point. *Simon*, 443 F. Supp. 3d at 115. Mere coordination and cooperation between separate entities does not show the requisite "*control* [that] renders the [principal] amenable to suit under ordinary agency principles." *Transamerica Leasing*, 200 F.3d at 849 (emphasis added).

*Finally*, it makes no difference that a member of MÁV's board of directors helped oversee a restructuring that involved MÁV-START. Here too, *Transamerica Leasing* is on-point: The district court's findings "describe nothing more than the sole shareholder exercising its influence, through the Board of Directors ...." 200 F.3d at 851.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the District Court and dismiss the case.

Respectfully submitted,

*/s/ Gregory Silbert*

Konrad L. Cailteux
Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Konrad.Cailteux@weil.com
Gregory.Silbert@weil.com

November 21, 2022

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 12,908 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced type-face using Century Schoolbook font in 14 point size.

*/s/ Gregory Silbert*
Konrad L. Cailteux
Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Konrad.Cailteux@weil.com
Gregory.Silbert@weil.com

November 21, 2022

# CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Gregory Silbert*

Konrad L. Cailteux
Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
Konrad.Cailteux@weil.com
Gregory.Silbert@weil.com

November 21, 2022

# ADDENDUM: STATUTES AND REGULATIONS

## TABLE OF CONTENTS OF ADDENDUM

28 U.S.C. § 1604 ........................................................................ 64

28 U.S.C. § 1605(a)(3) ............................................................. 64

The Foreign Sovereign Immunities Act provides in relevant part:

**28 U.S.C. § 1604. Immunity of a foreign state from jurisdiction.**

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**28 U.S.C. § 1605(a)(3). General exceptions to the jurisdictional immunity of a foreign state.**

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . .

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .